*19*

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

SEP 0 5 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| LUIS ALEJANDRO GARZA, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. B-02-154 |
| | * | |
| UNITED STATES OF AMERICA, | * | |
| Defendant. | * | |

## *BRIEF IN SUPPORT OF THE UNITED STATES*
### *MOTION TO DISMISS AND ALTERNATIVE MOTION FOR SUMMARY JUDGEMENT*

TO THE HONORABLE JUDGE OF SAID COURT:

Defendant, United States of America, moves to dismiss this lawsuit for want of subject matter jurisdiction and failure to state a claim.  See FRCP, Rules 12(b)(1) and (6).  In the alternative, the United States seeks a summary judgment as to all issues raised by the Plaintiff in his Complaint.  See FRCP, Rule 56(b).

The United States is immune from suit on the basis that the allegations raised by the Plaintiff fall under the discretionary functions of officials with the United States Bureau of Prisons.  Such discretionary functions are specifically exempt from coverage under the Federal Tort Claims Act.  See 28 U.S.C. 2680(a).  Therefore, when applied, subject matter jurisdiction is removed from this Court therefore requiring a dismissal of the lawsuit under Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure.

## 1.    Background

The plaintiff, Luis Alejandro Garza, is an inmate who is currently serving two concurrent terms of imprisonment, each of 324 months, to be followed by five years of supervised release, for conspiracy to possess with intent to distribute in excess of five kilograms of cocaine.  The sentence was imposed on July 24, 2000 by United States

District Court Judge Hilda G. Tagle of the Southern District of Texas.

At the time the incident at issue occurred (February 6, 2001), Plaintiff was confined at the United States Federal Correctional Institution located at Three Rivers, Texas. His current place of confinement is the United States Penitentiary (USP), Pollock, Louisiana, where he was designated on September 17, 2002.

On February 6, 2001, there was a disturbance at FCI, Three Rivers, in the course of which the plaintiff and three other inmates, Felipe Castro-Ontiveros, Jesus Martinez-Orosco, and Jose Jaime sustained injuries. The disturbance involved several inmates with rival gang affiliations. See Defendant's Exhibit 1[1], pp. 002 and 015. Ultimately, three inmates were found guilty of "Aiding and Abetting an Aggravated Assault" and sentenced to additional terms of confinement. Id. at p. 012.

The plaintiff's injuries included severe head trauma, a laceration to the forehead, and numerous contusions and abrasions on the upper body. He was first taken to the Beeville Hospital, and from there he was airlifted to Spohn Memorial Hospital in Corpus Christi. Id. at p. 002.

Plaintiff timely submitted an administrative claim seeking money damages from the United States for the injuries he received as a result of this incident. That claim was denied on March 4, 2002. See Plaintiff's Complaint, para. 5. Then, on July 26, 2002, Plaintiff filed the suit at bar asserting that the United States "was negligent by failing to use ordinary diligence to keep its prisoners safe and free from harm", and that this negligence

---

[1]Defendant's Exhibit 1 is a copy of an Incident Report prepared as a result of the February 6, 2001 incident at issue in the Plaintiff's Complaint. Information reflecting an individual's known or suspected gang affiliation has been withheld in an effort to protect these individuals from possible reprisals due to known or suspected gang affiliations.

"was a proximate cause of serious and permanent injuries suffered by the plaintiff." See

Plaintiff's Complaint at para. 6; the Complaint also cites to 18 U.S.C. 4042.

The United States filed its answer denying liability. In its answer to Plaintiff's

Complaint, the United States affirmatively asserted that this Court lacked subject matter

jurisdiction over Plaintiff's claims and that Plaintiff's claims failed to state a claim upon

which relief can be granted.

2.    **Argument**

A. **An Overview of Discretionary Function**

The discretionary function exception to the FTCA is set forth at 28 U.S.C. § 2680(a).

It provides that the Federal Tort Claims Act's waiver of the United States sovereign

immunity does *not* extend to:

> Any Claim based upon an act or omission of an
> employee of the Government, exercising due care,
> in the execution of a statute or regulation, whether
> or not such statute or regulation be valid, or based
> upon the exercise or performance or the failure
> to exercise or perform a discretionary function or duty
> on the part of a federal agency or an employee of the
> Government, whether or not the discretion involved
> be abused.

Thus, when applied, the discretionary function exception removes a suit from the subject-

matter jurisdiction of the court. Buchanan v. US, 915 F.2d 969, 970 (5th Cir. 1990). The

Supreme Court has provided the rationale underlying the discretionary function exception

and an analytical approach to determine its applicability.

In United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),

467 U.S. 797, 808 (1984), the Court stated that the discretionary function exception

"marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808 (1984). Accordingly, the Court recognized that Congress believed that imposing liability on the government for its employees' discretionary acts "would seriously handicap efficient governmental operations." Varig Airlines, 467 U.S. at 814.

In United States v. Gaubert, 499 U.S. 315 (1991), the Supreme Court continued to emphasize this purpose. As it did in Varig Airlines, the Court continued to stress that the purpose of the discretionary function exception was to "'prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" Gaubert, 499 U.S. at 323, *quoting* Varig Airlines, 467 U.S. at 814. However, in *Gaubert*, the Court also provides and describes a two-part test used to analyze an FTCA case to determine whether the discretionary function defense applies.

First, a court should consider the nature of the conduct and determine whether it involves "*an element of judgment or choice*'." United States v. Gaubert, 499 U.S. 315, 322, 328 (1991) *quoting* from Berkovitz v. United States, 486 U.S. 531, 536 (1988). If the government conduct in question does *not* involve such judgment or choice, the discretionary function exception would *not* apply. For example, "if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow'", the requirement of judgment or choice is not satisfied "because 'the employee has no

4

rightful option but to adhere to the directive.'" *Id*.

Once the United States establishes that the act or conduct in question involved judgement or choice, Gaubert instructs us to focus on "the nature of the actions taken and on whether they are susceptible to policy analysis." Gaubert, 499 U.S. at 325. Hence, the court must focus on "the nature of the conduct, rather than the status of the actor." Varig Airlines, 467 U.S. at 813; see also, Buchanan v. United States, 915 F.2d 969, 971 (1990).

In other words, the government must show that the challenged conduct was the sort of conduct the discretionary function was designed to shield. Id. If it is, the court must dismiss the case for want of subject matter jurisdiction–even if the challenged conduct was an abuse of that discretion. Id.; see also, 28 U.S.C. 2680(a).

**B.    The Discretionary Function Exception Applies in the Case at Bar.**

In the case at bar, the plaintiff alleges that "Defendant was negligent by failing to use ordinary diligence to keep its prisoners safe and free from harm." Plaintiff's Complaint at para. 6. In support of this allegation, Plaintiff cites to 18 U.S.C. 4042. This statute requires the Bureau of Prisons, through the United States Attorney General to:

> (1)    *have charge and management and regulation of all Federal penal and correctional institutions;*
> (2)    *provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise;*
> (3)    *provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States;*
> (4)    *provide technical assistance to State and local government in the improvement of their correctional systems; and,*
> (5)    *provide notice of release of prisoners in accordance with subsections*

*(b) and (c).*[2]

18 U.S.C. 4042(a)(1)-(5).

It is assumed that Plaintiff--based on the facts he has alleged--believes the government to be negligent in failing to "provide for [his] protection" while confined at the United States Penitentiary at Three Rivers, Texas. As pleaded, the discretionary function exception of the Federal Tort Claims Act should apply.

### 1.  **Choice**

By citing to 18 U.S.C. 4042, Plaintiff suggests that since he was injured while in the custody of the Bureau of Prison's, the government was negligent in its general  duty to provide protection for him–one of its inmates.     However, "even though a statute or regulation imposes a general duty on a government agency, the discretionary function exception may still apply if the agency retains sufficient discretion in fulfilling that duty." Cohen v. United States, 151 F.3d 1338, 1342 (11th Cir. 1998).  In Cohen, the Eleventh Circuit reasoned that "'(w)hile it is true that § 4042 sets forth a mandatory duty of care, it does not, however, direct the manner by which the Bureau of Prisons must fulfill this duty. The statute sets forth no particular conduct the Bureau of Prisons personnel should engage in or avoid while attempting to fulfill their duty to protect inmates.'" Id. at 1343, citing Calderon v. United States, 123 F.3d 947, 950 (7th Cir. 1997).

The Fifth Circuit recognized as much in its 1990 opinion in Buchanan v. United States, 915 F.2d 969 (5th. Cir. 1990).  In Buchanan, federal inmates brought an FTCA suit

---

[2]Sections (b) and (c) of this statute, which are not provided here, relate to the Bureau of Prison's obligations regarding the issuance of "Notice of Release of Prisoners" and "Notice of Sex Offender Release" which are clearly not at issue in the case at bar.

against the United States as a result of the 1987 Cuban National riots that took place at the Federal Correctional Facility located at Oakdale, Louisiana. In affirming the United States entitlement to dismissal under the discretionary function exemption, the Court noted that "...no statute, regulation, or policy does, or indeed could, specifically prescribe a course of action for prison officials to follow in every prison uprising". Id. at 971.

In the case at bar, Plaintiff and others were attacked by "multiple inmates" at the Recreation Yard of the Federal Correctional Institution at Three Rivers, Texas. See Defendant's Exhibits 1 (pp. 002 and 015) and 2 and  Plaintiff's Complaint at para. 6. An investigation of the incident indicated that as many as forty inmates may have been involved in this fight. See Defendant's Exhibit 1, p. 004. The prison facility at Three Rivers was placed in a lock down status and every inmate was interviewed. Id., pp. 002-003. Prison officials from all departments of the facility acted in a swift and efficient manner in order to gain control over a dangerous situation and provide medical assistance to those in need of it.  See Defendant's Exhibits 1 (pp. 017-034) and 2.

This situation, like that in the Buchanan case, was an event requiring prison officials to act quickly in a chaotic atmosphere—using their best judgment—to bring a violent situation under control.  Title 18 U.S.C. 4042 does not tell the government or its employees what they are to do to quell the violence.  That is impossible.

As stated by the Declaration of Allen Beard, the Captain at the Three Rivers facility on February 6, 2001, "[c]entral to the BOP's management practices is the principle that all staff members are considered first to be correctional workers first, and then to be teachers, case managers, secretaries, or whatever their position titles may be." Defendant's Exhibit 2.  As such, "the management of inmates requires flexibility on the part of the staff."  Id.

7

Therefore, Three Rivers officials, in exercising their obligation to protect the plaintiff, had to exercise their judgement and make choices in how they were going to protect him.

## 2. Choices Were Policy Based

Next, we must consider whether "the nature of the decision or conduct at issue is "susceptible to policy analysis." United States v. Gaubert, 499 U.S. 315, 325 (1991). In Buchanan, the Fifth Circuit approached this issue by quoting from the Supreme Court's opinion in Bell v. Wolfish, 441 U.S. 520, 547 (1979):

> Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

In the case at bar, the Bureau of Prisons has set no specific numerical limits governing how many inmates there are to each staff member nor has it established any numerical limits on the number of inmates who may congregate at any one particular time. Rather, the Bureau of Prisons officials are expected to exercise sound correctional judgement in determining how inmates are classified and how many inmates may congregate at any one time, place, or occasion. See Defendant's Exhibit 2.

Such "minute to minute decision making", as was necessary on February 6, 2001, should be considered "an activity requiring the exercise of discretion..." Buchanan, 915 at 972. In this suit, Plaintiff is asking this court to "second guess" the decisions of prison officials. To do so, would be to expose the government to tort liability where the Congress did not intend it to be. Id.

Accordingly, the United States should be dismissed from this suit pursuant to the discretionary function exemption.

## C.    Conclusion

The discretionary function exception to the Federal Tort Claims Act applies in this case. Therefore, this lawsuit should be dismissed for want of subject matter jurisdiction and failure to state a claim upon which relief can be granted. To the extent that this Court may deem it necessary to look to matters beyond the scope of the pleadings herein, the Defendant moves, in the alternative, for summary judgment on the basis that, as a matter of law, Defendant is entitled to judgment.

Respectfully submitted,

MICHAEL T. SHELBY
United States Attorney

NANCY L. MASSO
Assistant U.S. Attorney
600 E. Harrison, #201
Brownsville, TX 78520
Tel:    (956) 548-2554
Fax:    (956) 548-2549
Texas State Bar No. 00800490
Federal I.D. No. 10263

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the true and foregoing "Brief in Support of United States' Motion to Dismiss and Alternative Motion for Summary Judgement "was mailed on this the 5th day of SEPTEMBER, 2003 via Certified Mail, Return Receipt Requested to Barry R. Benton, Attorney at Law, 284 Ebony Avenue, Brownsville, TX 78520.

NANCY L. MASSO
Assistant United States Attorney

9

# FEDERAL BUREAU OF PRISONS
## FEDERAL CORRECTIONAL INSTITUTION
## THREE RIVERS, TEXAS



Master File Number
**I- 0682**

February 21, 2002

Prepared By: _____
R. Webster, SIS Lieutenant

Reviewed By: _____
H. Allen Beard, Jr., Captain

Reviewed By: _____
Philip Childs, AW(P)

Reviewed By: _____
Edward Perez, Warden

001

**FOI EXEMPT**
**D.O.J. SENSITIVE**
**LIMITED OFFICIAL USE ONLY**





U.S. Department of Justice

Federal Bureau of Prisons

---

Three Rivers, Texas 87071

**February 21, 2002**

MEMORANDUM TO: Edward Perez, Warden

FROM:                    R. Webster, Special Investigative Supervisor

SUBJECT:                 SIS Casefile #1-0682
                         Assault- Inmate on inmate

## INCIDENT

On February 6, 2001, at approximately 7:06 p.m., Recreation Yard staff observed a commotion and several inmates running near the Bocci ball/Weight cage area. Upon responding, they observed inmate Castro-Ontiveros, Felipe #25117-177, lying on the ground bleeding from head injuries. Inmate Garza, Luis #92434-079, was also found nearby, lying on the ground bleeding from head injuries. Responding staff secured the Recreation Yard and transported inmates Garza and Castro-Ontiveros to the Health Services Unit. Medical staff conducted injury assessments on both inmates and determined they sustained severe head trauma. Both inmates were transported to Spohn Beeville Hospital by ambulance for treatment and were subsequently airlifted to Spohn Memorial Hospital, Corpus Christi, for further treatment. A census was conducted of all inmates on the Recreation Yard and checked for injuries. Inmates Jaime, Jose #89539-079, and Martinez-Orosco, Jesus #71774-079, ████████████████████ were found to have facial injuries. They were examined by medical staff and placed in the Special Housing Unit. Preliminary investigation revealed at least 40 Border Brother gang members assaulted inmates Garza, Castro-Ontiveros, Jaime and Martinez-Orosco. The assault was a result of Border Brother gang members attacking Texas Syndicate gang members. The institution was locked down and additional staff recalled to the institution. All identified Border Brother gang members and associates were placed in the Special Housing Unit. All identified Texas Syndicate gang members and associates were also placed in the Special Housing Unit. The FBI was notified and responded to the institution at approximately 10:00 p.m. The institution was placed on lock down status pending mass interviews and further investigation. The case was referred to the AUSA and accepted for prosecution.

## INVESTIGATION

On February 06, 2001, inmates on the Recreation Yard suspected in the assault were placed in the Special Housing Unit. Their clothing was confiscated and placed in individual paper sacks. Each sack was labeled as evidence and issued an ECN number.

On February 7, 2001, mass interviews were conducted of the entire FCI inmate population. The FBI and DPS evidence recovery team responded to the institution at approximately 9:00 a.m., and collected evidence at the crime scene.

## WITNESS INTERVIEWS

On February 10, 2001, at 9:00 a.m., the SIS Office conducted an interview with Confidential Informant #R13011. C/I #13011 provided the following statement: I was playing basketball on the outdoor basketball court. Fifty Border Brothers started running from the handball court. One inmate got hit with a pipe or something. Another inmate by the weight cage got seriously assaulted. I ran towards the indoor basketball area as the Border Brothers were behind me. I thought they were after us, (Black inmates). A little bald headed inmate got hit with a pipe or something near the large gates near the officers station. About six inmates jumped him.

C/I #13011 was provided a photograph spread sheet and provided the following information. C/I #13011 stated inmate Hernandez Mendez #50118-079, was the first inmate to assault inmate Castro by the weight cage. He stated he observed inmate Acosta-Licea by the handball court, but did not see him fighting. C/I #13011 stated he observed inmate Marrufo-Ortiz assaulting inmate Castro by the weight pile by hitting him with a bocci ball. Inmate Acuna was observed assaulting inmate Castro by the weight pile. Inmate Giles-Rodriguez was observed assaulting inmate Castro also. C/I #13011 stated he observed inmate Garcia-Becerra digging a knife out of the dirt before the assault occurred. He stated he observed inmate Benitez-Dominguez also digging in the dirt looking for a knife. He said inmate Garcia-Aguilar assaulted inmate Garza near the ice machine.

On February 10, 2001, at 9:20 a.m., the SIS Office conducted an interview with Confidential Informant #13012. C/I #13012 provided the following statement: I was working out near the pull up bars. Several Mexican inmates started running around, so I made my way up front to get out of the way of things. I did not see any inmates fighting with weapons. I don't know who they were after, but there were two Mexican inmates hauled out of the Recreation Yard on stretchers. I would not want to testify in court.

On February 10, 2001, at 9:40 a.m., the SIS Office conducted an interview with Confidential Informant #13147. C/I #13147 made the following statement: I was at the bocci ball court when I saw people running from the handball court. There were a bunch of Mexican inmates fighting. I could not recognize who was fighting because there were so many of them. Some of the inmates grabbed bocci balls and took them into the fight. I would not want to testify in court.

Page3
Assault- Inmate on Inmate _     )
I-0682

On February 10, 2001, at 9:45 a.m., the SIS Office conducted an interview with Confidential Informant #14111. C/I #14111 stated the Border Brothers got word a week ago about an assault on Border Brothers by the Texas Syndicate, Barrio Aztecas and Black inmates in Leavenworth. C/I #14111 said the PRM gang members did not back up the Border Brothers on their assault on the Texas Syndicate.

On February 10, 2001, at 9:50 a.m., the SIS Office conducted an interview with Confidential Informant #13158. C/I #13158 provided the following statement: I was playing bocci ball with another inmate on the bocci ball court closest to the weight cage. I saw hordes of Mexican inmates running my way from the handball court. Half of them went around the weight cage and trapped two guys. Thirty to forty of them attacked one guy playing dominoes. He got up and started knocking them down. He made his way to the inside basketball court for more room. Another inmate grabbed a bocci ball and ran towards the inmate getting assaulted by the wall near the bikes. He threw the bocci ball at his head. I could not recognize him. One inmate got hit with a red water jug. The water jug ended up near the soccer field. One inmate from Jim Wells A was leading the group assaulting one inmate, (Inmate Castro). Another inmate involved had a Border Brother tattoo on his neck. It appeared the Border Brothers jumped the Texas Syndicate. I don't know why it happened, the Border Brothers don't run anything on the yard. I think the Border Brothers would get hurt if they returned to the compound. People don't like what they did to the Texas Syndicate.

On February 10, 2001, at 9:50 a.m., the SIS Office conducted an interview with Confidential Informant #14214. C/I #14214 provided the following statement: I was in the weight cage working out when I heard people running. I saw a large group of Mexican inmates running. Half of them went towards the bocci ball court, half went around the weight cage like it was planned. I saw them assaulting two inmates, one by the Recreation cage, one by the wall.

On March 7, 2001, at 11:40 a.m., the SIS Office conducted an interview with Confidential Informant #14001. C/I #14001 was provided a photograph spread sheet for identifying inmates. He made the following statement: I was sitting on the bleachers when I saw a large group of Mexican inmates by the handball court. One guy, (Castro) was being assaulted by several inmates. Inmate Lopez-Lopez #03511-180, was striking him with a water cooler. The cooler was bluish green with a white top. Inmate Castro-Guzman #07170-081, was kicking inmate Castro. Inmate Giles-Rodriguez #07267-081, was kicking inmate Castro. Inmate De Jesus Flores #11799-051, was also involved in the assault.

On March 7, 2001, at 10:00 a.m., the SIS Office conducted an interview with Confidential Informant #14112. C/I #14112 provided the following statement: I went to the Recreation Yard at 7:00 p.m., and went to use the restroom when I saw several inmates fighting. I could not recognize the inmates fighting, nor would I identify them. I saw one inmate by the first name of "Jesus", on the ground being assaulted by about ten inmates.

On March 7, 2001, at 11:00 a.m., the SIS Office conducted an interview with Confidential Informant #13931. C/I #13931 provided the following statement: I was lifting weights when I saw a group of inmates walk towards the handball court. They came back with even more inmates. About twenty to thirty inmates come running from behind the weight cage and started

kicking an inmate by the bicycles. He covered up on the ground as they were kicking him. One inmate was hitting him with a red cooler. I think the cooler was left out there by the track. During the assault, one guy came back to the one on the ground and hit him in the face with a bocci ball. He picked up the ball and struck the guy on the ground again in the head. The guy with the bocci ball said, "That's what you get for messing with La Raza.". I then saw several inmates kicking an inmate by the wall near the bicycles.

## VICTIM INTERVIEWS

On February 20, 2001, at 9:45 a.m., the SIS office conducted an interview with inmate Castro-Ontiveros, Felipe #25117-177. Inmate Castro stated he has been at FCI Three Rivers for three to four months and has no gang affiliations. He said he is a ▮▮▮▮▮ from Mexico. Castro stated he has never had any problems with the Border Brothers before he was assaulted. Inmate Castro said he could not recall what happened to him on February 6, 2001. He said he remembered doing laundry that day and not much else. He did not remember going to the Recreation Yard, or being assaulted. Castro said he is willing to testify in court regarding the assault. Inmate Castro said he thought the Border Brothers may have assaulted him because he does not associate with them. He said he talks to everyone and doesn't know who the Texas Syndicate members are.

On February 22, 2001, at 10:00 a.m., the SIS Office conducted an interview with inmate Garza, Luis #92434-079. Inmate Garza stated he has been at FCI Three Rivers for four months and has 27 years left on his sentence. Garza said, when he first got to FCI Three Rivers, he associated with inmate Cisneros, a Texas Syndicate member. He said he mostly keeps to himself and is not a gang member. Inmate Garza stated he did not know why he was assaulted. Garza said he was sitting on a bike when several inmates began running around. He said someone ran up to him and hit him. Garza said he fell from the bike and several other inmates began assaulting him. Garza said that there was so many of them, that he could not identify them. Inmate Garza said he has no enemies on the compound and does not want to testify against the inmates who assaulted him.

On February 6, 2001, at 9:10 p.m., the SIS Office conducted an interview with inmate Martinez-Orosco, Jesus #71774-079. Martinez stated he was playing chess by the officers station on the Recreation Yard with a Cuban inmate. He said approximately 20 Mexican inmates ran up to him and inmate Jaime and started assaulting them. He said the Mexican inmates didn't like the inmates from Texas. Martinez said he did not want to seek prosecution against the inmates who assaulted him. He said he did not see inmates Castro-Ontiveros and Garza being assaulted. He also stated Castro-Ontiveros and Garza were not Texas Syndicate members.

On February 6, 2001, at 9:30 p.m., the SIS Office conducted an interview with inmate Jaime, Jose #89539-079. Inmate Jaime stated he is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ has been at FCI Three Rivers approximately one month. Jaime said he went to the Recreation Yard at the 7:00 p.m., movement and was talking to inmate Martinez-Orozco #71774-079, at the card tables near the indoor basketball court. Inmate Jaime said approximately twenty or more Hispanic inmates began running towards him and began hitting and kicking him. He said many of them had steel toe boots on. Jaime stated he attempted to defend himself by fighting back, but there were too many of them. He said staff approached the area and the inmates ran off. Inmate Jaime said he did not

Page5 )
Assault- Inmate on Inmate
I-0682

know why they attacked him. He did not have any prior warning anything was going to happen. Inmate Jaime said he did not want to prosecute the inmates who assaulted him.

## SUSPECT INTERVIEWS

On February 07, 2001, inmate Acosta #77295-079, was interviewed by the Operation's Lieutenant. Inmate Acosta made the following statement: I was on the track, running at the time of the incident. I was by myself. I didn't think anything happened.  I have not seen anything.

On February 07, 2001, inmate Garcia #43648-198, was interviewed by the Operation's Lieutenant. Inmate Garcia made the following statement: I was on the basketball court when I saw a lot of people running. I would not tell anything if I did see something. I'm doing my own time. I was not involved in any assault.

On February 06, 2001, inmate Sanchez #34385-008, was interviewed by the Operation's Lieutenant. Inmate Sanchez made the following statement: I was walking on the track with another guy I met here. I did not see anything happen.

On February 06, 2001, inmate Garcia #41579-198, was interviewed by the Operation's Lieutenant. Inmate Garcia made the following statement: I was walking on the track. I would not tell if I was involved in anything. I don't think anything happened.

On February 06, 2001, inmate Dominguez #15500-047, was interviewed by the Operation's Lieutenant. Inmate Dominguez made the following statement: I was walking on the track when the officers directed me to sit on the bench. I don't know anything, I didn't know anything happened.

On February 06, 2001, inmate Najera #79395-080, was interviewed by the Operation's Lieutenant. Inmate Najera made the following statement: I was by myself when I went to the Recreation Yard. When I got there, I saw everyone was running around. I just sat at a table near the racket ball court. I didn't see anything and if I did, I wouldn't say anything.

On February 06, 2001, inmate Flores #38691-198, was interviewed by the Operation's Lieutenant. Inmate Flores made the following statement: I was at the handball court, watching the games. I was by myself. I guess something happened, I don't know. If I was responsible for anything, I would tell you.

On February 07, 2001, inmate Duran #30901-198, was interviewed by the Operation's Lieutenant. Inmate Duran made the following statement: I was on the track, walking by myself. People started running around, but I don't know what happened. If I did know, I would not tell.

Page6
Assault- Inmate on Inmate
I-0682

On February 10, 2001, inmate Miller #07065-180, was interviewed by the SIS Office. Inmate Miller made the following statement: I was at the basketball court when I saw people running. When they stopped, I saw two people were down. I don't know what happened. I was not involved in any fights. I am not a Border Brother ████████████ I don't know who's a Border Brother and who's not. I don't know if the people involved were gang members. I don't know why the video tape would show me involved.

On February 10, 2001, inmate Segura #95253-080, was interviewed by the SIS Office. Inmate Segura made the following statement: I was playing handball. I was not involved in anything, nor have I been involved in any gang activities. I didn't notice anything unusual out there.

On February 07, 2001, inmate Perez-Rosales #29505-077, was interviewed by the SIS Office. Inmate Perez made the following statement: I was sitting on the bench near the handball courts. There were several people playing handball. I don't know what happened, I wasn't involved in anything.

On February 07, 2001, inmate Lopez-Jurado #83113-080, was interviewed by the SIS Office. Inmate Lopez-Jurado made the following statement: When I got to the yard, the officers were directing all the inmates to go to the track. I got to the yard after whatever happened. I was not involved in anything.

On February 16, 2001, inmate Ortuno #09593-085, was interviewed by the SIS Office. Inmate Ortuno made the following statement: I was picked up three days after the incident. I was on the basketball court that night. I was not involved in any fights or assaults. I am not a Border Brother ███████████████████ I don't know why the Border Brothers hit those inmates.

On February 16, 2001, inmate Sanchez #04970-180, was interviewed by the SIS Office. Inmate Sanchez made the following statement: I was on the yard by the handball court. I was not involved in the fight, I don't know why they fought. I am not a Border Brother.

On February 16, 2001, inmate Giles-Rodriguez #07267-081, was interviewed by the SIS Office. Inmate Giles-Rodriguez made the following statement: I was playing basketball at the time of the incident. I was not involved in the fight and I am not a Border Brother.

On February 16, 2001, inmate Aguirre-Tibra #83205-079, was interviewed by the SIS Office. Inmate Aguirre-Tibra made the following statement: I was walking on the track, then came back by the area where the bikes are. I was not involved in anything. I am not a Border Brother ███
████████████████

On February 16, 2001, inmate Garnica #43951-008, was interviewed by the SIS Office. Inmate Garnica made the following statement: I am not a Border Brother, but I hang out with the Mexicans. I would not get along with the Aztecas's. I was by the pull up bars when move was announced. Staff directed me to go back to the yard. I only saw a bunch of people running. I was not involved in the fight.

Page7
Assault- Inmate on Inmate
I-0682

On February 16, 2001, inmate Ramos-Rodriguez #87275-079, was interviewed by the SIS Office. Inmate Ramos-Rodriguez made the following statement: I have the nicknames, "Negro" and "Scarface". ██████████████ I was by the handball court when I saw a lot of people running. I was not involved in any fights.

On February 16, 2001, inmate Yanez #05931-030, was interviewed by the SIS Office. Inmate Yanez made the following statement: I am not a Border Brother. I get along with everyone. I was in Live Oak A at the time of the incident. I heard the Border Brothers got in a fight with the Texas Syndicate. I didn't know anything was going to happen.

On February 16, 2001, inmate Rodriguez #05592-196, was interviewed by the SIS Office. Inmate Rodriguez made the following statement██████████████ I was on the track by myself. I was not involved in any fight. I don't know if ████ Border Brothers were involved. I don't know what happened.

On February 16, 2001, inmate Cruz-Gonzalez #07915-081, was interviewed by the SIS Office. Inmate Cruz-Gonzalez made the following statement: I am ████ a Mexican. I was walking on the track when I saw a lot of people running. Staff told me to sit on the benches. I think someone got into a fight, but I don't know who. I don't know if the Border Brothers were involved.

On February 16, 2001, inmate Lopez-Lopez #03511-180, was interviewed by the SIS Office. Inmate Lopez-Lopez made the following statement: ██████████████ I was playing handball ██████████ I don't have any problems with anyone. I was not involved in a fight.

On February 16, 2001, inmate Ramos #31717-048, was interviewed by the SIS Office. Inmate Ramos made the following statement: I was on the yard when I saw a bunch of people running. I didn't have anything to do with it, so I went the opposite direction. ██████████████ ██████████████ I sensed something was wrong, but I didn't see anyone getting hit.

On February 16, 2001, inmate De Jesus #11799-051, was interviewed by the SIS Office. Inmate De Jesus made the following statement: ██████████████ I was walking the track at the time of the incident. I didn't see anything, just a bunch of people running around. I was not involved in a fight and would not tell if I was.

On February 16, 2001, inmate Benitez #49595-198, was interviewed by the SIS Office. Inmate Benitez made the following statement: ██████████████ I was walking the track ██████ ██████ I did not see who was fighting, only people running. I was not involved in a fight.

On February 16, 2001, inmate Hernandez #65595-080, was interviewed by the SIS Office. Inmate Hernandez made the following statement: ██████████████ but was not involved in a fight. I was on the outside of the weight cage, but didn't see much. I just saw a lot of people running. I don't have any problems with anyone.

On February 16, 2001, inmate Maldonado #78072-079, was interviewed by the SIS Office. Inmate Maldonado made the following statement: ██████████████ am from El Salvador. I was cleaning by the basketball court where they play dominos. I saw people running

around, but didn't see anyone fighting. I was not involved in a fight and don't know who was
fighting.

On February 16, 2001, inmate Fraire #17197-051, was interviewed by the SIS Office. Inmate
Fraire made the following statement: ██████████████████ I was playing basketball
when people started heading for the yard. I didn't see anyone fighting. I was not involved in
anything.

On February 16, 2001, inmate Vargas #63454-008, was interviewed by the SIS Office. Inmate
Vargas made the following statement: ████████████ I was walking the track by myself.
I don't know what happened and wouldn't say if I did. I was not involved in anything. I have no
problems with anyone. ██████████████████████ nothing was
planned.

## STAFF MEMORANDUMS

On February 7, 2001, W. Martin, Recreation Specialist, submitted a memorandum in regards to
the assault. Mr. Martin made the following statement: On February 6, 2001, at approximately
7:10 p.m., after securing the front gate and after the 7:00 p.m., move, I noticed inmates running
from the patio area. I observed inmate Martinez, Jesus #71774-079, fall to the ground, going into
a fetal position. I called for assistance via radio. I observed inmate Castro-Guzman, Francisco
#07170-081, over inmate Martinez kicking and throwing punches with closed fists to inmate
Martinez's upper torso and head area. As I approached inmate Martinez, I yelled and inmate
Castro turned toward me and ran back inside the patio area. I also observed inmate Jaime, Jose
#89539-079, being kicked and punched by numerous inmates in the patio area. Numerous
inmates were pushing the gate so that inmate Castro could return to the patio area. Recreation
Specialist Romero and myself secured the recreation grill.

On February 06, 2001, D. Esparza, Senior Officer Specialist, submitted a memorandum in regards
to the assault. Officer Esparza made the following statement: On 02-06-01, at approximately 7:09
p.m., Willie Martin, Recreation Specialist, called for assistance on the recreation yard, stating
there was a fight between gangs. As this was occurring, this reporting officer was stationary on
the berm overlooking the recreation yard in the outside patrol vehicle #2. I was unable to observe
the altercation due to my view being blocked by the hand ball court walls. Immediately staff
requested medical staff. Upon arrival of J. Rannefeld, Operations Lieutenant, at approximately
7:11 p.m., he requested local EMS. Two inmates were then taken to medical. Local EMS arrived
at approximately 7:24 p.m. Later at approximately 8:30 p.m., both inmates were transported by
local EMS to an outside hospital.

On February 07, 2001, D. Romero, Recreation Specialist, submitted a memorandum regarding the
assault. Ms. Romero made the following statement: On February 06, 2001, at approximately 7:10
p.m., I was at the metal detector monitoring inmate traffic entering/exiting the Recreation Yard
during the open compound movement. After completing the move, I was en route back to the
Recreation Yard when the incident occurred. I witnessed inmate Martinez #71774-079, running
from the inside patio area past the recreation corridor gate being chased by an undetermined

Page9
Assault- Inmate on Inmate
1-0682

amount of inmates behind him. Inmate Martinez fell to the ground in a fetal position outside the recreation corridor gate. Mr. Martin notified Control by radio and I ran to lock the corridor gate. I witnessed inmate Castro #07170-081, and another unknown inmate assaulting inmate Martinez. The unknown inmate ran back inside the patio area after striking inmate Martinez with his closed fists several times. Inmate Castro continued to assault inmate Martinez with his closed fists, kicking him several times, then ran back inside the patio area. I yelled at Castro to stop, but he did not comply. I was attempting to lock the recreation corridor gate while an undetermined amount of inmates were pushing the gate for inmate Castro to run back inside the patio area after assaulting inmate Martinez. Inmate Maldanado #02691-079, was begging me to let him out before I locked the gate. He stated, "They're gonna get me." I allowed inmate Maldanado access through the corridor gate, then locked the gate with the assistance of Mr. Martin. We waited for additional staff to arrive before proceeding inside the patio area. There was an undetermined amount of inmates running around the patio area. When additional staff arrived, I proceeded to the outside recreation area where I encountered inmate Castro, Felipe #25117-177, laying unconscious outside the weight pile with facial injuries. I also observed inmate Garza, Luis #92434-079. He had been assaulted and was walking from behind the sit up benches located outside the wellness area. I was telling inmate Garza to sit down, but he was incoherent, his entire left side of his face was swollen, bloody and was unable to walk without assistance. The medical staff arrived and the inmates had to be carried out on stretchers.

## PHYSICAL EVIDENCE

| | |
|---|---|
| ECN 01-12; | Video Tape of Recreation Yard Assault. Released to Brian Ritter, FBI, on February 8, 2001, for analysis. |
| ECN 01-16; | Clothing belonging to inmate Rodriguez #05592-196. |
| ECN 01-17; | Clothing belonging to inmate Castro #25117-107. |
| ECN 01-18; | Clothing belonging to inmate Jaime #89539-079. |
| ECN 01-19; | Clothing belonging to inmate Perez-Rosalez #29505-077. |
| ECN 01-20; | Clothing belonging to inmate Anthony #86959-080. |
| ECN 01-21; | Clothing belonging to inmate Najera #79395-080. |
| ECN 01-22; | Clothing belonging to inmate Sanchez-B. #34385-008. |
| ECN 01-23; | Clothing belonging to inmate Fernandez #41395-198. |
| ECN 01-24; | Clothing belonging to inmate Dominguez #15500-047. |
| ECN 01-25; | Clothing belonging to inmate Fonseca #11925-045. |
| ECN 01-26; | Clothing belonging to inmate Lopez-J. #83113-080. |
| ECN 01-27; | Clothing belonging to inmate Martinez #71912-198 |
| ECN 01-28; | Clothing belonging to inmate Fraire #17197-051 |
| ECN 01-29; | White tennis shoes belonging to inmate Acosta #77295-079 |
| ECN 01-31; | Clothing belonging to inmate Garza #92434-079 |
| ECN 01-32; | Clothing belonging to inmate Garza #92434-079 |
| ECN 01-33; | Clothing belonging to inmate Lopez #03511-180 |
| ECN 01-34; | Clothing belonging to inmate Nieblas #07032-081 |
| ECN 01-35; | Clothing belonging to inmate Velasquez #32312-008 |
| ECN 01-36; | Clothing belonging to inmate Flores #38691-198 |
| ECN 01-37; | Clothing belonging to inmate Garcia #41579-198 |

010

Page 10
Assault- Inmate on Inmate                        )
1-0682

| ECN 01-38; | Clothing belonging to inmate Duran #30901-198 |
| ECN 01-40; | Clothing belonging to inmate Ramos #31717-048 |
| ECN 01-41; | Clothing belonging to inmate Ortiz #50184-198 |
| ECN 01-42; | Clothing belonging to inmate Vargas #63454-008 |
| ECN 01-43; | Clothing belonging to inmate Molina #28110-077 |
| ECN 01-44; | Clothing belonging to inmate Hernandez #65595-080 |
| ECN 01-45; | Clothing belonging to inmate Maldanado #78072-079 |
| ECN 01-46; | Clothing belonging to inmate Garcia #25967-080 |
| ECN 01-47; | Clothing belonging to inmate De Jesus #11799-051 |
| ECN 01-48; | Clothing belonging to inmate Garcia #43648-198 |
| ECN 01-49; | Clothing belonging to inmate Bedolla-D. #71695-079 |
| ECN 01-50; | Clothing belonging to inmate Cruz-G. #07915-081 |
| ECN 01-51; | Clothing belonging to inmate Benitez #49595-198 |
| ECN 01-52; | 8MM Video tape of Recreation Yard census of inmates. |

## ADDITIONAL INFORMATION

M. Silva, P.A., conducted an injury assessment on inmate Jaime #89539-079. Inmate Jaime sustained abrasions to his head, face and left ear.

M. Silva, P.A., conducted an injury assessment on inmate Martinez #71774-079. Inmate Martinez sustained abrasions to his left eye and left side of his face.

M. Silva, P.A., conducted an injury assessment on inmate Castro-Ontiveros #25117-177. Inmate Castro-Ontiveros sustained severe head trauma, a laceration to his forehead, and numerous abrasions and contusions to his upper body. He was transported to Beeville Hospital for treatment and subsequently air lifted to Spohn Memorial Hospital, Corpus Christi, for emergency surgery.

M. Silva, P.A., conducted an injury assessment on inmate Garza #92434-079. Inmate Garza sustained severe head trauma, abrasions to the left side of his head, face and ear and numerous abrasions and contusions to his upper body. He was transported to Beeville Hospital for treatment and subsequently air lifted to Spohn Memorial Hospital, Corpus Christi, for emergency surgery.

ECN 01-12, video tape of the incident, was released to the FBI for review. The video tape was subsequently sent to the FBI headquarters in Quantico, Virginia, where still photographs were produced from the film.

On March 28, 2001, the FBI made contact with several lieutenants and officers in an effort to identify suspects of the assault which occurred on February 06, 2001. The staff members were individually provided a book consisting of 44, 8X10 black and white photographs and a video surveillance tape depicting the FCI's camera coverage of the incident. The still photographs were images prepared by the FAVIAU Unit at the Federal Bureau of Investigation (FBI) Laboratory.

Inmate Resendez-Mendez, Luciano #53275-004, was identified by Lieutenant D. Bullard, Lieutenant F. Lara, Lieutenant G. Rosales, Lieutenant F. Brown, Officer F. Martinez and Officer

L. Anzaldua. Resendez-Mendez was observed actively assaulting inmate Castro.

Inmate Fonseca, Lauro #11925-045, was identified in the video tape by Lieutenant D. Bullard, Lieutenant F. Lara, Lieutenant G. Rosales, Lieutenant F. Brown, and Officer L. Anzaldua. Inmate Fonseca was observed actively assaulting inmate Castro.

Inmate Perez-Martinez, Javier #55318-198, was identified in the tape by Lieutenant F. Lara, Lieutenant G. Rosales, Lieutenant F. Brown, and Officer L. Anzaldua.

Inmate Garcia-Becerra, Pedro #59771-065, was identified in the tape by Lieutenant D. Bullard, Lieutenant F. Lara, Lieutenant G. Rosales, Lieutenant F. Brown, and Officer F. Martinez. Inmate Garcia-Becerra was observed actively assaulting inmate Castro.

Inmate Benitez-Dominguez, Antonio #04321-097, was identified in the tape by Lieutenant D. Bullard, Lieutenant F. Lara, Lieutenant G. Rosales, Lieutenant F. Brown and Officer L. Anzaldua.

Inmate Najera-Gutierrez, Jose #79395-080, was identified in the tape by Lieutenant F. Brown, Lieutenant D. Bullard, and Officer L. Anzaldua.

Inmate Flores-Franco, Francisco #38691-198, was identified in the tape by Lieutenant G. Rosales and Lieutenant F. Brown.

Inmate Sandoval-Verdusco, Rosario #06170-081, was identified in the tape by Lieutenant R. Swain and Officer L. Anzaldua.

Three inmates were tried in a court of law and convicted for the assault which occurred on February 06, 2001, by the AUSA in Corpus Christi, Texas. The AUSA recommended the SIS refrain from closing this case until the conclusion of the prosecutions. On January 22, 2002, the SIS was notified the prosecutions and sentencing proceedings had been concluded and approval had been given to close the case and proceed with administrative actions. The following is a list of inmates convicted of the assault and their sentences.

On January 09, 2002, inmate Pedro Garcia-Becerra #59771-065, was sentenced to 63 months, 3 years supervision, no fine, $9,718 restitution, $100 special assessment.

On January 11, 2002, inmate Lauro Fonseca #11925-045, was sentenced to 22 months, 3 years supervision, no fine, $9,718 restitution, $100 special assessment.

On January 18, 2002, inmate Luciano Resendez-Mendez #53275-004, was sentenced to 96 months, 3 years supervision, no fine, $9,718 restitution, $100 special assessment.

Page12
Assault- Inmate on Inmate          )
I-0682
                                              )

# INMATE PROFILES

## VICTIMS

**Inmate Castro-Ontiveros, Felipe #25117-177,** is a 36 year old offender, serving a 71 month sentence for Illegal Re-Entry of an Alien. He has a projected release date of April 28, 2005, via Good Conduct Time Release. He has a detainer. He arrived at FCI Three Rivers on February 06, 2000, and is assigned to McMullen A Unit. He is a Medium security, In custody inmate with no CMC assignments. He is a citizen of Mexico, with no given address.

A review of disciplinary records shows inmate Castro-Ontiveros has received no incident reports. A review of SIS intelligence reveals no significant information regarding inmate Castro-Ontiveros.

**Inmate Garza, Luis 92434-079,** is a 27 year old offender, serving a 318 month sentence for Conspiracy and Possession with Intent to Distribute Cocaine and has a detainer. He has a projected release date of May 08, 2023, via Good Conduct Time Release. He is a Medium security, In custody inmate ████████████████████████ He arrived at FCI Three Rivers on September 14, 2000, and is assigned to Karnes B Unit. He is a citizen of the United States and has a legal address in Harlingen, Texas.

A review of disciplinary records shows inmate Garza has received no incident reports.

A review of SIS intelligence reveals inmate Garza has the nickname, "Louie". ███████████
██████████

**Inmate Jaime, Jose #89539-079,** is a 27 year old offender, serving a 37 month sentence for being a Felon in Possession of a Firearm. He has a projected release date of February 27, 2003, via Good Conduct Time Release. He arrived at FCI Three Rivers on January 11, 2001, and is assigned to Karnes B Unit. He is a Medium security, In custody inmate with no CMC assignments. He is a citizen of the United States with a legal residence in Corpus Christi, Texas.

A review of disciplinary records shows inmate Jaime has received no incident reports.



**Inmate Martinez-Orosco, Jesus #71774-079,** is a 42 year old offender, serving a 70 month sentence for being Unlawfully Found in the United States after Deportation. He has a projected release date of June 12, 2002, via Good Conduct Time Release and has a detainer. He arrived at FCI Three Rivers on October 10, 1999, and is assigned to Live Oak A Unit. He is a Medium security, In custody inmate ███████████████████ He is a citizen of Mexico, with no legal address given.

Page 13
Assault- Inmate on Inmate                )                                    )
I-0682

A review of disciplinary records reveals inmate Martinez has received no incident reports.

## ASSAILANTS

**Inmate Fonseca, Lauro #11925-045,** is a 25 year old offender, serving a 37 month sentence for Attempt to Possess, with Intent to Distribute Heroin. He has a projected release date of December 11, 2001, via Good Conduct Time Release. He is a Medium security, In custody inmate█████████████████████████ He is a citizen of Mexico, with a legal residence in Jalisco, Mexico.

A review of SIS intelligence reveals inmate Fonseca is a█████████████member. He also has an STG assignment of Management Interest Group 133.

**Inmate Resendez-Mendez, Luciano #53275-004,** is a 28 year old offender, serving a 70 month sentence for Re-Entry into the United States After Deportation. He has a projected release date of October 12, 2010, via Good Conduct Time Release. He is a Medium security, In custody inmate██████████████████ He is a citizen of Mexico, with no given legal residence.

A review of disciplinary records reveals inmate Resendez-Mendez has received one incident report for Assault (224) and one incident report for Destroying Government Property (329).

**Inmate Garcia-Becerra, Pedro #59771-065,** is a 34 year old offender, serving a 70 month sentence for Deported Alien Found in the United States (Felony). He has a projected release date of April 11, 2002, via Good Conduct Time Release. He is a Medium security, In custody inmate███████████████ Inmate Garcia-Becerra is a citizen of Mexico, with a legal residence in Altamirano, Mexico.

A review of disciplinary records shows inmate Garcia-Becerra has received two incident reports for Assault (224), two incident reports for Stealing (219), and one incident report for Refusing Programs (306).

**Inmate Castro-Guzman, Francisco #07170-081,** is a 32 year old offender, serving a 57 month sentence for Illegal Re-Entry of a Deported Alien. He has a projected release date of April 23, 2003, via Good Conduct Time Release. He is a High security, In custody inmate ██████████

Assault- Inmate on Inmate
1-0682                     )                                              )

██████████████████ He is a citizen of Mexico, with a legal residence in Queretaro, Mexico.

A review of disciplinary records shows inmate Castro-Guzman has received one incident report for Rioting (105), two incident reports for Fighting (201), one incident report for Threatening (203), one incident report for Destroying Property over $100.00 (218), one incident report for Refusing to Obey an Order (307) one incident report for Being Absent from Assignment (310), one incident report for Being Insolent (312), and one incident report for Failing to Stand Count (320).

████████████████████████████████████████████

## CONCLUSION AND RECOMMENDATIONS

This investigation clearly reveals that on February 06, 2001, at approximately 7:06 p.m., several members of the Border Brothers prison gang assaulted members and associates of the Texas Syndicate prison gang in the Recreation Yard. Inmate Castro-Ontiveros #25117-177, was assaulted by the weight cage. Inmate Garza #92434-079, was assaulted nearby, near the stationary bicycles. Inmates Jaime 89539-079, and Martinez-Orosco #71774-079, were assaulted near the indoor basketball court. It is believed the assault was a result of a previous dispute between the Border Brothers and Texas Syndicate at another institution. A video tape of the incident revealed several, approximately 30 inmates, running and assaulting inmates. It revealed, specifically, inmate Castro-Ontiveros being assaulted by several inmates near the weight cage. The video tape was secured as evidence and processed by the FBI. Frame by frame photographs were made of the video tape and reviewed by several Lieutenants and staff in an attempt to identify the assailants. Inmates Resendez-Mendez #53275-004, Fonseca #11925-045, and Garcia-Becerra #59771-065, were positively identified assaulting inmate Castro-Ontiveros and were subsequently prosecuted. Mr. Martin and Ms. Romero, Recreation Staff, positively identified inmate Castro #07170-081, assaulting inmate Martinez #71774-079, striking him with his fists and kicking him.

All identified Border Brother gang members and associates have been removed from general population and placed in the Special Housing Unit pending transfer or release from custody. The Texas Syndicate gang members and associates have been released back to general population.

Inmates Resendez-Mendez, Fonseca, Garcia-Becerra and Castro have been issued incident reports for Assault (101).

It is recommended inmates Resendez-Mendez, Fonseca and Garcia-Becerra be transferred to an institution deemed appropriate by the Administration. Their continued presence at FCI Three Rivers threatens the safety of inmate Castro-Ontiveros, as well as the safety, security and orderly running of the institution.

It is recommended inmate Castro-Ontiveros receive a CMC assignment of Separation from inmates Resendez-Mendez, Fonseca and Garcia Becerra. It is recommended inmate Martinez receive a CMC assignment of Separation from inmate Castro #07170-081.



**U.S. Department of Justice**
**Memordandum**
*Federal Bureau of Prisons*

---

**DATE:** *February 7, 2001*

**REPLY TO**
**ATTN . OF:** *W. Martin, Recreation Specialist*

**SUBJECT:** *Assault on Inmates*

**TO:** *Operation Lieutenant*

On February 6, 2001, at approximately 7:10pm, after securing the front gate and after the 7:00pm move, I noticed inmates running from the patio area. I observed inmate Martinez, Jesus # 71774-079, fall to the ground , going into a fetal position. I called for assistance via radio. I observed Inmate Castos-Guzman, Francisco # 07170-081, over inmate Martinez kicking and throwing punches with a closed fist to inmate Martinez's upper torso and head area. As I approached inmate Martinez, I yelled and inmate Castro turned toward me and ran back inside the patio area. I also observed inmate Jaime, Jose # 89539-079, being kicked and punch by numerous inmates in the patio area. Numerous inmates were pushing the gate so that inmate Castro could return to the patio area. Recreation Specialist Romero and myself secured the recreation grill.

016

February 7, 2001

MEMORANDUM FOR: Operations Lieutenant

FROM:              Warren Rabb, Rel. Serv. Corr. Counselor

SUBJECT:           "Response to a Body Alarm"

On Tuesday, 2-6-2001 @ approximately 7:20 P.M. I responded to a "Body Alarm" called by
Control "via" radio. At this time I was the only staff member in the Religious Services
Department with numerous inmates in the Chapel. I covered my post until properly relieved by
Chaplain Pequeno who was returning from the "Special Housing Unit" located in Jim Wells B
unit. After I was relieved by Chaplain Pequeno I responded to control to pick up three three pairs
of handcuffs and a video camera for the recreation yard. In route to the recreation department
Officer Diaz and cook foreman Cook needed help carrying inmate Garea, Luiz #92434-039 who
had a swollen head injury and was being transported in a hand lift stretcher into the medical
department. I immediately helped by carrying the head area of the stretcher and placed the
inmate on the examining table in the ER room in medical. This was directed by P.A. Silva. The
video camera was given to Officer Wong. I remained in the ER room until the inmate was
transported out of medical to go to a near by hospital. I then returned to the religious service
department to prepare for the order to evacuate inmates out of the Chapel to their correct housing
units. After this task was complete, I reported to the visitation room to wait for briefing and new
orders.


CC:     Operations Lieutenant
        Religious Services



**U.S. Department of Justice**

*Federal Bureau of Prisons*

*P.O. Box 4000*
*Three Rivers, Texas 78071*

February 8, 2001

MEMORANDUM FOR L.T. Rannefield

FROM: C.L. Bruno, Outside General Foreman

SUBJECT: Assualt On 2-6-01

On 2-6-01 at approximately 7:15 pm I responded to the scene of
the assault on inmates Garza, Luis # 92434-079,and inmate Castro-
Ontiveros # 25117-177.Upon my arrival I observed inmate Garza
laying on his back by the gate leading to the weight pile, and
inmate Castro-Ontiveros was on his back in front of the weight
pile. I than assisted other staff in loading inmate Garza on a
stretcher. We carried inmate Garza to the recreation gate, and
loaded him on a medical cart and was taken to medical. I than
returned to the basketball court area and assisted in the upper
torso search of the remaining inmates on the recreation yard.

018



**U.S. Depar. . .t of Justice**

*Federal Bureau of Prisons*

---

*P.O. Box 4000*
*Three Rivers, Texas 78071*

February 6, 2001

MEMORANDUM FOR H. Allen, Beard Jr., Captain

FROM:          J. Rannefeld, Lieutenant

SUBJECT:       Assault on Recreation Yard

On February 6, 2001, at approximately 7:05 p.m. Recreation staff, Mr. Martin call for assistance. This staff member observed inmate running from the patio area. He saw inmate Martinez, Jesus #71774-079 falling onto the ground and going into a fetal position. Inmate Castro-Guzman, Francisco #07170-081 was over inmate Martinez kicking and throwing punches with a closed fist. The fist were landing on the upper torso and head area. Mr. Martin then shouted at inmate Castro and the inmate turned toward him and ran inside to the patio area.

Mr. Martin also observed inmate Jaime, Jose #89539-079 being kicked and punched by numerous inmates in the patio area.

Recreation Specialist Romero, D. witnessed inmate Maldonado, Tomas #02691-079 attempting to exit the patio area. The inmate stated "their going to get me." Recreation staff, Martin and Romero allowed inmate Maldonado to exit the area. The two staff member secured the area until additional staff assistance arrived.

Recreation Specialist Humme, responded to the assistance call. Upon entering the caged weight pile area, he saw approximately 20 to 30 inmates outside the caged weight pile area. Mr Humme observed inmate Castro-Ontiveros, Felipe #25117-177 lying on the ground next to the entrance to the caged weight pile. Also, in the area was inmate Garza, Luis #92434-079. Staff reports both inmates were seen by staff with facial trauma.

The Duty Physician, Mr. Silva, was called to the scene to assist with the medical triage of the inmates.  I notified the Control Center to call 911 for the local ambulance service. During this time all inmates were separated on the recreation yard by responding staff.

scene was secured with tape to prevent unauthorized access. The video camera was brought to the recreation yard and each inmate was identified using the video camera. The inmates stated their name, number, and they were asked if they had any gang affiliations. The camera operator for this process was Lieutenant Brown.

During the identification process the Mexican National "Border Brothers" were removed from the immediate area. The preliminary investigation revealed that the "Border Brothers" were possibly involved in this assault. A total of 48 inmates "Border Brothers" were placed into Administrative Detention pending an investigation.

The following inmates were examined by Physician Assistant, Mr Silva, and the following injuries were noted:

- Castro-Ontiverous, Felipe #25117-177 injuries were a fully swollen face with large right forehead laceration. Multiple trauma of body/head trauma/forehead laceration/left eyebrow laceration.

- Garza, Luis #92434-079 injuries noted included facial trauma with a left swollen/closed eye. Fluid noted from left inner ear. Forehead hematoma and superficial abrasions. Conscious with projectile vomiting while in the treatment room

Also, following inmate injuries were noted during the initial response to the scene:

- Jamie, Jose # 89539-079 Outer ear redness, traces of dried blood. Superficial abrasion to left scalp and face, mild swelling of left face and left ear, reported no lost of consciouness, abrasions behind left ear.

- Martinez, Jesus #71774-079 no loss of consciousness reported, left eye hematoma, very small abrasion, left upper cheek, with dried bloody scab.

The following is the approximate timed events:

- At 7:15 p.m. the Control Center notified Captain Beard.

- At 7:30 p.m. all Housing Unit Officers were informed to secure all inmates in their cells. I instructed the Control Center Officer to recall initiate a partial recall of staff. These staff would be anyone near the institution.

- At approximately 8:00 p.m. Institution Duty Officer, Mrs. Swango, notified AW (P) Wiemann, Administrative Duty Officer, of the situation at the institution and he replied that he would be coming to the institution.

Emergency Medical Trip. The inmate was transported via Live Oak County EMS to Spohn/Beeville Hospital in Beeville, Texas.

- At 8:18 p.m. Inmate Garza #92434-079 was released on Emergency Medical Trip. The inmate was transported via Live Oak County EMS to Spohn/Beeville Hospital in Beeville, Texas

- At 8:35 p.m. Warden Purdy notified of the Assault.

- At 9:15 p.m. Mass interviews started.

- At 9:30 p.m. inmate Garza #92434-079 arrived at Spohn/Beeville Hospital in Beeville, Texas.

- At 9:35 p.m. Warden entered institution and was briefed by Captain Beard and AW(P) Wiemann.

- At 9:55 p.m. inmate Garza #92434-079 was transported to Spohn Memorial Hospital via airlift, in Corpus Christi, Texas.

- At 10:15 p.m. inmate Castro #25117-177 was transported from Spohn/Beeville to Spohn Memorial Hospital in Corpus Christi, Texas.

- At 10:30 p.m. inmate Garza #92434-079 arrived at Spohn Memorial Hospital.

- At 10:40 p.m. Federal Bureau of Investigation Agents arrived at the Federal Correctional Institution.

- At 10:50 p.m. Federal Bureau of Investigation, Special Agents Ritter notified the Corpus Christi FBI staff to attempt to interview victims at Spohn Memorial Hospital. IDO Mrs. Swango, contacted the Regional Duty Officer, Jill Ryan and she was notified of the situation at FCI Three Rivers.

- At 10:51 p.m. FBI Special Agents proceed to the Recreation Yard to investigate the crime scene.

- At 11:05 p.m. inmate Castro #25117-177 arrived at Spohn Memorial Hospital.

- At 12:00 p.m. Morning Watch Staff started entering the institution.

- At 12:05 a.m. Official Institution Count.

- At 12:15 a.m. FBI Special Agents departed the institution.

- At 12:20 a.m. Evening Watch released.

At approximately 1:15 p.m. upon receiving an initial
assessment from the hospital staff on the seriousness of
inmate Garza's #92434-079 injuries, the Institution Duty
Officer telephoned his wife, Melissa Garza in Brownsville,
Texas, to inform her that he was in the hospital with
serious injuries.

■   At 1:40 a.m. Institutional Count Clears.



UNITED )ATES GOVERNMENT
MEMORANDUM
FEDERAL BUREAU OF PRISONS
F.C.I. THREE RIVERS TX. PO BOX 4000

**DATE:**    February 07, 2001

**REPLY TO:**    D. Romero, Recreation Specialist (detail for training)

**SUBJECT:**    Assault On Inmates

**TO:**    Lt. Rannefield

On February 06, 2001, at approximately 7:10 PM, I Recreation Specialist Romero, while at the metal detector monitoring inmate traffic entering/exiting the recreation yard during the open compound. After completing the 7:00 PM move, I was en route back to the recreation yard when the incident occurred. I witness inmate Martinez #71774-079, running from the inside patio area past the recreation corridor gate being chased by an undetermined amount of inmates behind him. Inmate Martinez, fell to the ground in a fetal position outside the recreation corridor gate. Mr Martin notified control by radio and I ran to lock the recreation corridor gate. I witness inmate Castro, Francisco #07170-081 and another unknown inmate assaulting inmate Martinez. The unknown inmate ran back inside the patio area after striking inmate Martinez with a closed fist several times.    Inmate Castro #07170-081 continued to assault inmate Martinez with his closed fist, kicking him several times, then ran back inside the patio area. I yelled at inmate Castro to stop but he did not comply. I was attempting to lock the recreation corridor gate while an undermined amount of inmates were pushing the gate for inmate Castro #07170-081 to run back inside the patio area after assaulting inmate Martinez.

There was an inmate Maldonado, Tomas #02691-079, begging me to let him out before I locked the gate, he stated "their gonna get me." I allowed Maldonado #02691-079 access through the corridor gate then locked the gate with the assistance of Mr Martin. We waited for additional staff to arrive before proceeding inside the patio area. There was an undetermined amount of inmates running around in the patio area.

When additional staff arrived I proceeded to the outside recreation area where I encountered inmate Castro, Felipe #25117-177 laying unconscious, outside the weight pile with facial injuries. I also observed inmate Garza, Luis #92434-079, he had been assaulted he was walking from behind the sit up benches located outside the wellness area. I was telling inmate Garza to sit down but he was incoherent, his entire left side of his face was swollen, bloody and was unable to walk without assistance. The medical staff arrived inmates had to be carried out on stretchers.

U.S. GOVERNMENT
MEMORANDUM
FCI THREE RIVERS, TEXAS

DATE: 2-06-01

REPLY TO: *J Shipman*
ATTN OF: J. Shipman SO.

SUBJECT: Fight on Recreation yard

TO: Lieutenant Rannfeld

On 2-06-01 while working as the Karnes B unit officer, at approximately 7:05 pm, the control officer announced over the radio that staff needed assistance in the rec yard. I immediately responded to the emergency and upon my arrival LT. Rannfeld briefed us on the situation. We then started identifying all inmates on camera and inspected the inmates for scrapes and cuts. While conducting shakedown and visual inspection of the inmates all Border Brothers gang members and their associates were separate and escorted to Special Housing.

 

DATE: 02-07-01
Reply TO ATTN OF: D. Esparza, Senior Officer Specialist

SUBJECT: Fight on recreation yard

TO: J. Rannefeld, Operations Lieutenant

On 02-06-01 at approximately 7:09 p.m. Willie Martin, Recreation Specialist called for assistance on the recreation yard. Stating that there was a fight between gangs. As this was occurring this reporting officer was stationary on the berm overlooking the recreation yard in the outside perimeter vehicle # 2. I was unable to observe the altercation due to my view being blocked by the hand ball court walls. Immediately staff requested medical staff. Upon arrival of J. Rannefeld, Operations Lieutenant at approximately 7:11 p.m. he requested local EMS. Two inmates were then taken to medical. Local local EMS arrived at approximately 7:14 p.m.. Later at appproximately 8:30p.m. both inmates were transported by local EMS to an outside hospital.



**United States Government Memorandum**
**Correctional Services**
**F.C.I. Three Rivers**

**Date:** FERBRUARY 7, 2001

**Reply to the**
**Attention of:** SANTOYO, MARTIN C.    S.O.S.    *Martin C. Santoyo*

**To:** RANNEFELD, J. E/W OPERAITON LIEUTENANT

**Subject:** RECREATION FIGHT

On February 6, 2001, at approximately 7:10pm while performing
my duties as Mc Mullen A Unit Officer, I heard via radio
Recreation Officer W. Martin requesting staff assistance. I
immediately responded to the recreation out weight pile area.
I observed Recreation Officer Romero holding Inmate Garza, Luis
REG #92434-079 whom was standing up and conscious. Inmate Garza
was moved to a exercise bicycle, then placed on the ground face up.
Inmate Garza was placed on a gurney and taken to the F.C.I. Hospital
I returned to assist staff. I observed Inmate Castro, Felipe
Reg #25117-177 laying down unconscious outside the weight pile cage.
INMATE Castro was placed on a gurney and taken to the F.C.I. Hospital,
I returned to assist staff members, Inmates were searched and escort-
ed to their housing units.



**UNITED STATES GOVERNMENT**
**MEMORANDUM**
**FCI-THREE RIVERS, TEXAS**

February 6, 2001

Memorandum For: H. Allen Beard, Jr., Captain

From: F. Brown, Lieutenant

Subject: Incident in Recreation

On 2-6-2001, at 7:05pm, the Control Center announced that Recreation Staff called for assistance due to a assault in progress. I immediately responded to the recreation yard. Upon arriving I noticed two inmates restrained by staff that had just been assaulted standing at the entrance to recreation. I continued into the recreation area and headed for the weight pile. Approximately 30 to 40 inmates were running towards the track area. I then noticed an inmate laying on the ground against the weight pile fence that had numerous injuries and was unconscious. (Identified as Castro-Ontiveros #25117-177). I then noticed another inmate with serious head injuries walking around the stationary bikes. The inmate was identified as Garza, Luis #92434-079, I placed inmate Garza on the ground and waited for the on duty PA. Once the on duty PA arrived, I had responding staff initiate upper body visual searches on all inmates that were on the recreation yard. All inmates that were on the recreation yard were video recorded and then interviewed by staff. A total of 48 inmates (Border Brothers) were placed into Administrative Detention pending an investigation for assault.



')  ⌐

'  ) Department of Justice

# MEMORANDUM

Federal Bureau of Prisons
F.C.I. Three Rivers, Texas
Recreation Department

---

**Date:**   February 6, 2001

**Reply to**
**Attn of:**   *J. Humme.* Assistant Supervisor of Recreation

**Subject:**   Disturbance in Recreation

**Thru:**   E/W Operation Lt.

**To:**   SIS

On February 6, 2001, at approximately 7:05 P.M., I heard Recreation Spec. W. Martin. call for staff assistance to the Recreation Yard in the Basketball/Patio Area. As I exited the Leisure Center. I saw Mr. Martin and Ms. Debra Romero, Recreation Specialist, attempting to lock the large grill (gate) to the main entrance of the Rec. Yard. As I got to the gate, I could see several inmates running from the Patio area, next to the main entrance, heading for the weight pile/outside areas. I then opened the gate and followed a large group of inmates leaving that area. When I turned the corner to follow the inmates. I saw approximately twenty to thirty inmates outside the caged weight pile area. As I approached the caged weight pile area, the inmates continued to walk or run toward the outside track and field area. As they cleared the weight pile area. I saw an inmate lying on the ground next to the entrance to the caged weight pile. I also saw an inmate wearing a grey sweat shirt, tan pants and a grey wool cap (pulled down low on his head) stop and kick the inmate that was laying on the ground. The unidentified inmate kicked the inmate. lying on the ground, (later identified as Castro #25117-177) in the chest. I attempted to identify the inmate who had kicked inmate Castro however, his back toward me and inmate Castro's injuries needed immediate attention. Once I got to inmate Castro, I could see the inmates that had been in the weight pile area leaving the outside basketball court area for the track and field area. The track and field area was secured by other responding staff as I called for medical assistance and give aide and protection to inmate Castro.

028

United States Government
# MEMORANDUM
Three Rivers, Texas

Date:    February 06, 2001

Reply to
Attn of:    A. Lemos / Senior Officer Specialist

Subject : Fight in Recreation Yard on 02-26-01

To: J. Rannefeld  / Lieutenant


On February 06, 2001 at approximately 7:05PM FCI Control Center announced, via 2 way radio, for all additional staff to report to the recreation yard for a fight in progress. Upon arriving at the entrance of the Recreation  gate, I observed inmate Martinez-Orosco # 71774-079 attempting to enter the Leisure Center . He was  bleeding from his left eye and breathing hard as if he had been exercising.  I placed handcuffs on the inmate and placed him against the wall until additional staff had everything under control.  I then escorted inmate Martinez-Orosco to the Special House Unit (JWB) pending investigation of the incident.

Lt. Rannefeld  then requested me to  prepare to escort an inmate out of the institution.  I reported to the armory and checked out the necessary equipment. At approximately 8:30PM Inmate Garza, Luis #92434-079 was transported via EMS Ambulance to Beeville Spohn hospital. We arrived at the hospital at approximately 9:30PM.  Upon arrival at the hospital the doctors determined that inmate Garza's injuries were too severe for that  hospital to handle and that inmate Garza needed to go a Trauma Center Hospital.  A Halo flight was called to transport Garza to Corpus Christi Spohn Memorial Hospital. At 9:55PM inmate Garza was airlifted to Corpus Christi Spohn Memorial Hospital where we arrived at 10:30 PM.

Arrangements were made to get a CT-SCAN of inmate Garza's head and upper body to try and determine how severe his injuries were.  At 11:00 PM the CT-SCAN  was preformed on Garza.  He had a fractured skull on the left side of his head.  The injuries were  determined to be  life threatening injuries and  emergency surgery  would have to be preformed to try and repair the damaged skull.

At approximately 11:35PM the inmate was moved back to the Emergency Room until the surgery could be preformed on him.  I was relieved by Mr. David Salyers at 12:00am where he assumed duties of the inmate.  I then reported back to the institution for further instructions.



U.S. Department of Justice

Federal Bureau of Prisons

---

Three Rivers, Texas 78071

February 7, 2001

MEMORANDUM TO: J.Bannefeld / Lieutenant

FROM: R.A. Cavazos Sr.Officer

SUBJECT: Fight in Recreation Yard on 2-06-2001.

On February 6,2001 at approximately 7:05 pm F.C.I. Control Center announced ,via radio ,for all additional staff to the rec area for a fight in progress Upon arrival at the enterance of the rec gate I observed Inmate Jime,Jose #89539-079.on his knees ,I also observed that he had cut to his let side of his head and scratches on his body, I then placed the inmate in cuffs and escorted him to the medical dept.

While additional staff arrived i then reported to the front enterance of medical to assist staff to help with inmates being seen in the emergency room .I them was instructed by Act. Lieutenant Wong to report to the front entrence to receive equpment for a emergency trip ,

At approximately 8:05 p.m. I and Cook foreman I. Cook were in route to beeville hospital via ambulance with inmate Castro ,Felipe #25117-177. At approximately 9:15 p.m. while in the emergency room ,Emergency staff notified me that inmate inmate Garza #92434-079 need to be flowen out via Halo -life Flight . At this time I then called the institution and notifed the operations Lieutenant of the situation .

Inmate Garza was flown out at approximately 9:55p.m. via Spohn Memorial hospital in Corpus Christi, Texas ,At Approximately 10:30 p.m. I and officer Diaz were in route via ambulance to Corpus Christi Spohn Hospital while in route I called and talked to Lt. F. Brown that were in route with inmate Castro  to Corpus Christi ,Upon arrival at approximately 11:05 p.m. Inmate Castro was very uncoporative with emergency staff inmate Castro was not aware of his surroundings upon assessment from the nurse and the Doctor on call X -rays and Cat Scans need to be done .

030

At Approximately 1:30 am inmate was taken to get a cat scan ,around 3:35 a.m. i was told that the inmate was not going to be able to be moved due to the  head trauma he had recived I then notified the institution of the situation .

At Approximately 5:00 a.m. inmate Castro was move to I.C.U. 1 room 5. Inmate was still being uncooperative at this time. I.C.U. staff then sedated the inmate, due to the medication he had recived he remained asleep thru the duration of my watch .

# MEMORANDUM

### Federal Correctional Institution
### Three Rivers, Texas

DATE: 02/07/01

REPLY TO
ATTN. OF: R.HERNDON S.O.S.

SUBJECT: Fight on the Recreation Yard

TO: Lieutenant J. Rannefeld

On February 6, 2001, I was working as the Control Center #1 officer, at approximately 7:05 p.m. I received a radio transmission for staff needing assistance on the recreation yard. I immediately notified all radio units that staff needed assistance on the recreation yard, and for all housing units to secure their doors, and closed the compound. At approximately 7:15 p.m. I called 911 and requested two ambulances to be sent to the F.C.I., immediately. At 7:30 p.m. I notified the housing unit officers to start locking down the institution. At this time we started recalling local staff to the institution, as staff arrived the recreation yard was cleared and all inmates believed to be involved were taken to special housing. At 7:35 p.m. the ambulances arrived, and E.M.S. personal were escorted into the institution. At 8:05 p.m. inmate Castro #25117-177 was sent by ambulance to the local hospital due to serious head injuries. At 8:18 p.m. inmate Garza #92434-079 was sent by ambulance to the local hospital with serious head injuries. At approximately 9:30 p.m. twenty inmates, believed to be involved in the fight, had been placed in special housing. At approximately 11:30 p.m. twenty three-additional inmates were placed in the special housing overflow unit pending investigation for fighting. At 12:05 a.m. I called an official institutional count, all inmates were accounted for, and the institution remains on lockdown status.

832



U.S. Department of Justice

Federal Bureau of Prisons

P.O. Box 4000
Three Rivers, Texas 78071

February 7, 2001

MEMORANDUM TO H. ALLEN BEARD, CAPTAIN

FROM:              Sheri Swango, IDO
                   Assistant Supervisor of Education

SUBJECT:           Assault on Recreation Yard

On Tuesday, February 6, 2001, at approximately 7:05 p.m. I was in my office
in the Education Department when I heard Mr. Willie Martin, Recreation
Specialist, call for assistance due to a "gang fight" on the Recreation
Yard.  It was approximately one minute after Mr. Martin called for staff
assistance due to the fight, as I was responding to the Recreation Yard,
that I heard Mr. Joe Humme, Assistant Recreation Supervisor, call for
assistant from the medical department because of an inmate down near
the outside of the caged weight pile in Recreation with head injuries.  As
I rounded the corner in the gym to go towards the area outside the caged
weight pile I observed Mr. Humme standing near inmate Castro-Ontiveros,
Felipe - Reg. #25117-177 who was lying on the ground near the entrance to
the weight pile with bleeding head injuries and Recreation Specialist,
Debra Romero walking around with inmate Garza, Luis - Reg. #92434-079.
Inmate Garza, #92434-079 was walking in a staggering manner and showing
obvious head injuries as his head was swollen and blood was coming from his
left ear.  There were no other inmates in the immediate area outside the
caged weight pile but a large number of inmates were walking from the
basketball area towards the track area.  After arriving I assisted Ms.
Romero in talking with inmate Garza, #92434-079 to try to get him to sit
down while the PA was coming.  After inmate Garza, #92434-079 sat down I
went towards Mr. Humme who told me he needed a stretcher.  As I was going
to get a stretcher, I observed Mrs. Claudia Brinkman bringing a stretcher
towards the scene and the Duty Physician, Mr. Silva responding with Mrs.
Brinkman.

...At approximately 7:10 p.m. after medical staff had arrived, I left the
Recreation area, that was at that time secured, and went to the Control
Center to assist the Control Center officer and to call in additional
staff.  The ambulance had already been called by the officer.

...At approximately 7: ) p.m., Captain Beard was notified of the situation and I began making calls from the Control Center for additional staff to respond to the institution.

...At approximately 7:30 p.m., all Housing Unit Officers were informed to secure all inmates in their cells.

...At approximately 7:45 p.m., I was relieved in the Control Center by David Rios, Food Service Foreman, and I went to the Front Entrance to escort in the Live Oak County EMS. The EMS immediately began working on inmate Castro, #25117-177 when they arrived in the medical department.

...At approximately 7:50 p.m., I returned to the Control Center and continued to call additional staff.

...At approximately 8:00 p.m., I notified AW Wiemann, the ADO, of the situation at the institution and he replied that he would be coming to the institution.

...At 8:05 p.m. Inmate Castro, #25117-177 was released on an Emergency Medical Trip and transported to the Spohn Beeville Hospital in Beeville, Texas, via Live Oak County EMS.

...At 8:18 p.m. Inmate Garza, #92434-079 was released on an Emergency Medical Trip and transported to the Spohn Beeville Hospital in Beeville, Texas, via Live Oak County EMS.

...At 8:20 p.m. AW (P) Wiemann arrived at the institution.

...At 8:35 p.m. Warden Purdy was notified of the assault.

...At 9:15 p.m. Mass interviews were begun.

...At 9:35 p.m. Warden Purdy entered the institution and was briefed by Captain Beard and AW (P) Wiemann.

...At 9:55 p.m. inmate Garza, #92434-079 was transported to Spohn Memorial Hospital in Corpus Christi, Texas, via airlift.

...At 10:15 p.m. inmate Castro, #25117-177 was transported to Spohn Memorial Hospital in Corpus Christi, Texas, via ambulance.

...At 10:30 p.m. inmate Garza, #92434-079 arrived at Spohn Memorial Hospital in Corpus.

...At 10:40 p.m. FBI Agent arrived at the institution.

...At 10:50 p.m. Federal Bureau of Investigation Agent Ritter notified the Corpus FBI staff to call for agents to interview the victims at the hospital.

...Additionally, at 10:50 p.m. the Regional Duty Officer, Jill Ryan, was notified of the situation.

...At 10:51 p.m. the FBI agents went to investigate the crime scene.

...At 11:05 p.m. inmate Castro, #25117-177 arrived at Spohn Memorial Hospital in Corpus.

...At 12:00 p.m. the Morning Watch staff began to enter the institution.

...At 12:05 p.m. the institution count was conducted.

...At 12:15 p.m. the FBI agents departed the institution.

...At 12:20 p.m. the evening watch staff were released from the institution.

...At approximately 1:15 a.m. upon receiving an initial assessment from the hospital staff on the seriousness of inmate Garza's, #92434-079 injuries, I telephoned his wife, Melissa Garza in Brownsville, Texas, to inform her that he was in the hospital with serious injuries.

...At approximately 3:20 a.m. I departed the institution.

If you have any further questions concerning this matter, please do not hesitate to contact me.

UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| LUIS ALEJANDRO GARZA, | S | |
| | S | |
| PLAINTIFF, | S | |
| V. | S | CIVIL NO. CA-B-02-154 |
| UNITED STATES OF AMERICA, | S | |
| | S | |
| DEFENDANT. | S | |

## DECLARATION OF ALLEN BEARD

In accordance with the provisions of Section 1746 of Title 28, United States Code, I, the undersigned Allen Beard, do hereby make the following unsworn declaration, under penalty of perjury, pertinent to the above-styled and numbered cause:

I, Allen Beard, am currently employed by the Federal Bureau of Prisons (BOP) as Chief Correctional Supervisor, or Captain, at the Metropolitan Correctional Center (MCC), New York, New York. I have been employed by the BOP since July, 1991, when I was hired as a Correctional Officer at , USP Lompoc, California . Subsequently, I was promoted to the positions of Senior Officer at USP Lompoc, Senior Officer Specialist at USP Florence, Colorado. Lieutenant (GS-9) at FCI Fairton, New Jersey , Lieutenant (GS-11) at USP Leavenworth, Kansas, and Captain at FCI, Three Rivers, Texas, where I served in that capacity from November, 2000 through May, 2002. Throughout my employment by the BOP, I have received training in many topics. Much of that training centered upon supervision, custody, and control of inmates. The more advanced training in those areas I received upon my promotion to Lieutenant, and then

-1-



upon my promotion to Captain.  Conversely, I have given training on a number of occasions, and am very familiar with the manner in which the Bureau of Prisons manages inmate populations.

I understand that the plaintiff in this suit was assaulted by other inmates on the Recreation Yard at FCI, Three Rivers, on 6 February 2001.  That assault occurred while I was Captain at that facility.

With respect to the principles which govern the management of inmates, I know that the BOP has not established numerical limits governing how many inmates a staff member, whether from the Correctional Services Department or otherwise, may supervise at a time.  Nor has the BOP established a numerical limit as to the number of inmates who may congregate at a time. While it is true that inmates are not allowed to conduct an official function, such as a religious service, without staff supervision, inmates may congregate informally for the purpose of socializing.  Staff, exercising sound correctional judgment in their supervision of the institution, are to watch for groups that might be too large, or for behavior which appears sinister.  This supervision, however, is based upon the exercise of sound correctional judgment, not upon fixed numerical limits.

Central to the BOP's management practices is the principle that all staff members are considered first to be correctional workers first, and then to be teachers, case managers, secretaries, or whatever their position titles may be.  The significance of this principle is that every staff member bears responsibility for management of inmates, so that the custodial presence of staff members in a given place at a given time is measured by the number of staff members there, not merely the number from the Correctional Services Department.  For example,

-2-

on the Recreation Yard, where the plaintiff was assaulted, the custodial presence would include Correctional Services staff, Recreation Department staff, and any other staff in the vicinity.

Another principle central to the BOP's management practices is that of the readiness of staff to move to any part of the facility in the case of unusual situations, including, but not limited to, assaults such as the one sustained by the plaintiff. When an unusual situation arises in one part of the institution, such as the Recreation Yard, arises, other staff, from many different departments, converge rapidly upon the scene so as to restore normal conditions as promptly and safely as possible.

From the foregoing discussion it can be understood that there the management of inmates requires flexibility on the part of staff. For this reason, the BOP has not established limits as to the number of inmates which a staff member may supervise at one time, nor does the BOP prohibit inmates from congregating for the purpose of socializing.

I declare under penalty of perjury that the foregoing is true and correct. Executed this **22nd** day of July, 2003.

Allen Beard
Chief Correctional Supervisor
Metropolitan Correctional Center
150 Park Row
New York, New York 10007-1779

-3-