2 4

United States District Court
Southern District of Texas
FILED

OCT 1 4 2003

Michael N. Milby
Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

LUIS ALEJANDRO GARZA     \*

                            \*

VS.                             \*    CIVIL ACTION NO. B-02-154

                            \*    FEDERAL TORT CLAIMS ACT

THE UNITED STATES OF     \*

AMERICA                     \*

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS AND MOTION FOR CONTINUANCE OF DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, LUIS ALEJANDRO GARZA, Plaintiff in the above-entitled and numbered cause and files this his response to Defendant's motion to dismiss, and moves for a continuance of the hearing on Defendant's motion for summary judgment, and in support thereof would respectfully show as follows:

1.

When reviewing the merits of a motion to dismiss under Rule 12 (b) (1) and (6) the court should assume that the facts alleged in the complaint are true, construe the complaint liberally in favor of the Plaintiff and not dismiss the complaint unless it appears beyond a doubt that Plaintiff can prove no set of facts upon which relief can be granted. *Kane Enterprises v. Magregor* (U.S.A.), Inc. 322 F. 3d 371,374 (5th Cir. 2003)

## 2.

Plaintiff alleges in his FIRST AMENDED COMPLAINT that while a prisoner at Defendant's Three Rivers Correctional Facility he was severely beaten by inmates. Plaintiff further alleges that the investigation conducted by prison officials concluded that a prison gang called the "Border Brothers" were apparently retaliating against Plaintiff and four other inmates whom they believed were part of another prison gang called the "Texas Syndicate". Plaintiff denies any gang affiliation.

## 3.

Plaintiff has further pled that employees of the Federal Bureau of Prisons knew, and continue to know, that gang violence is a real and continuing threat to the safety of persons living and working in penitentiaries.

## 4.

Plaintiff further alleges that at the time he was beaten that he was one of over two hundred inmates in the facility's recreation yard who were to be supervised by one guard, officer Deborah Romero.[1] Plaintiff further alleges that Romero was under "SPECIFIC POST ORDERS FOR RECREATIONAL PATROL" to patrol and supervise the recreation yard and to prevent inmates from gathering into "large groups."[2]

---

[1] See Exhibit 1.

[2] See Exhibit 2, pages 1 and 5.

## 5.

Plaintiff further alleges that despite these orders officer Romero was not patrolling the recreation yard or supervising the inmates but in fact allowed approximately 70 inmates to gather into a group over a period of about 45 minutes, first near the basketball courts and then the handball courts.[3] Plaintiff further alleges that the group split into two parts, with one group of about 35 inmates attacking Plaintiff, and the rest attacking other inmates, one of whom, like Plaintiff, was severely injured.[4]

## 6.

Plaintiff alleges that as a result of the assault he suffered a fractured skull, loss of hearing in his left ear, TMJ Syndrome, frequent and severe headaches and a large scar on the left side of his head.[5]

## 7.

The government's motion to dismiss is based upon the premise that the recreation patrol officer's failure to supervise the inmates in the recreation yard and prevent inmates from gathering into a large group were discretionary decisions excepted from liability under the Federal Tort Claims Act.

---

[3] See Exhibit 1, page 2.

[4] See Exhibit 2, pages 21, 24-25, 32, 34, 37, 39 and 43.

[5] See Exhibit 1, pages 2-3.

### 8.

The government cites the court to the relevant cases analyzing when a federal employee's choice in implementing an administrative policy rises to the level of a discretionary decision which Congress indeed intended to shield from judicial review. *Berkovitz v. United States,* 486 U.S. 531, 108 S. Ct. 1954 (1998)*; United States v. Gaubert,* 499 U.S. 315, 111 S. Ct. 1267 (1991)*; United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 104 S. Ct. 2755 (1984)*; and, Buchanan v. United States,* 915 F. 2d. 969 (5th Cir. 1990).

### 9.

The discretionary function exception to liability under the Federal Tort Claims Act, set out in 28 U.S.C. 2680(a), has two clauses. The first clause exempts actions mandated by statute or regulation, but only if the actor exercises due care. The second clause exempts all actions, regardless of negligence, if they involve the type of decisions which pertain to choices in formulation or implementation of legislative or administrative policy. The government moves for dismissal based upon the latter clause.

### 10.

In the government's motion, by arguing that the Bureau of Prisons has no specific numerical limits or rule governing ratio of staff to inmates, impliedly acknowledges that there were ridiculously few staff

supervising a vast number of inmates in the recreational yard on the occasion in question. The government makes the same argument that because there are no "numerical limits on the number of inmates who may congregate at any one particular time" that a guard's decision to allow seventy inmates to gather was a discretionary decision shielded from liability.

11.

Under the analysis set out in *Berkovitz*, supra, if no choice is involved, there is no immunity. Also see *Louisiana v. Public Investors, Inc.*, 35 F. 3d 216, 220-221 (5th Cir. 1994). It is Plaintiff's position that Romero had no discretion whether or not to patrol the yard and whether or not to prevent a large group from gathering. During the relevant time, Romero was under specific post orders to patrol the yard, except during open movement between 6:55 and 7:05 pm.[6] Plaintiff claims that the perpetrators had been gathering for 45 minutes before the attack, which the government estimates started about 7:10 pm.[7] Statements taken by the government from inmates who were present show that it was obvious there was danger brewing and that no one was patrolling the yard.[8] At least two inmates actually left the area before the assault

---

[6] See Exhibit 2, pages 1-2.

[7] See Exhibit 2, pages 14-15.

[8] See Exhibit 2, pages 21, 24-25, 32, 34, 37, 39 and 43.

started to get out of harm's way.[9] Another inmate stated that before and at the time the assault commenced that he was with Romero at the entrance gate.[10] In short Romero's failure to patrol the yard and prevent a massive gathering of inmates was a violation of mandatory, specific, post orders with no discretionary decision-making present.

### 12.

However, in the event the court finds that officer Romero had a choice as to when to patrol the recreational yard, and a choice as to what she considered a "large group," the discretionary function exception still would not apply. Such choices or decisions are not the type that the discretionary function exception was designed to protect.

### 13.

The Supreme Court has continually held that Congress' intent in creating the discretionary function exception was to prevent judicial second-guessing of legislative and administrative decisions regarding creation and implementation of social, economic, political or administrative policy. *United States v. Varig Airlines*, 104 S. Ct., at *2764-2765 (1984) and Dalehite v. United States, 73 S. Ct. 956, 968 (1953).* By claiming that Romero's choices, if any, were choices grounded in implementation of social, economic, political or

---

[9] See Exhibit 2, pages 21 and 24.

[10] See Exhibit 2, pages 45-46.

administrative policy the government is attempting to stretch the discretionary function defense too far. The Court in *Gaubert,* supra, explained that there are many mundane, discretionary decisions which governmental employees must make which do not rise to the status of a policy choice. Justice White noted that a government employee driving an automobile would need to constantly exercise discretion, but that the employee's decisions could "hardly be said to be grounded in regulatory policy." At S.Ct. page 1275, FN 7. Likewise, Romero's decisions whether to patrol the yard or whether 70 inmates constituted a large group clearly were not decisions "grounded in regulatory policy."

14.

In response to the government's alternative motion for summary judgment, Plaintiff moves the court to continue the hearing on the motion until discovery has been completed. Discovery in this matter has proceeded slowly. The government has slowly produced voluminous records from the Bureau of Prisons and the Federal Bureau of Investigation. Plaintiff's counsel has had to review approximately 1500 pages of documents, with the government still withholding several documents under claim of privilege. Plaintiff intends to ask the court to review those documents *in camera*. The government has yet to produce multiple photographs reportedly depicting the relevant area before and during the assaults.

15.

Now that plaintiff has had an opportunity to review most of the government's records, he intends to propound additional interrogatories asking the government to identify each inmate and guard in the recreational area during the hour and a half before the assaults, the reasons and policies behind the post orders forbidding the inmates to gather in large groups, and if necessary seek to compel the government to identify other assaults which have occurred at the recreational yard in question within the past ten years.

16.

Because access, by necessity, is severely restricted access in a penitentiary, Plaintiff must depose and/or obtain permission to interview the inmates whose statements are attached as exhibits to this response, namely, P. Garza, no. 86842-079; Hammers, no. 29501-077; Hodges, no. 09177-035; Alfonzo Martinez, No 85652-079; Romero, no. 39571-008; G. Haynes, no. 03996-025; Danny Schertz, no. 0610-112; L.D. Richardson, no. 23687-077; Cory Williams, no. 76893-079; Robert Alford, no. 02020-081; Gomez, no. 05760-080; Frazier, no. 46222-079; Sergio Diaz, no. 83514-080; S. Diaz-Alvarez, no. 83514-080; D. Brock, no. 10471-035; and Cabrera-Pris, no. 93405-079.

17.

Plaintiff also intends to depose the government employees who have been identified as having knowledge of what occurred at the recreation yard during the hour or so before the assaults, including, but not limited to, guards Deborah Romero and Willie Martin and D. Esparza.

18.

Wherefore, Plaintiff prays the government's motion to dismiss be denied and that the court continue the hearing on government's alternative motion for summary judgment until Plaintiff has been afforded adequate time to conduct discovery.

Respectfully submitted,

Barry R. Benton
284 Ebony Ave.
Brownsville, Texas 78520
Telephone (956) 546-9900
Facsimile (956) 546-9997
Federal I.D. No. 3968
ATTORNEY IN CHARGE FOR
LUIS ALEJANDRO GARZA

## **VERIFICATION**

I, Barry R. Benton, attorney in charge for Plaintiff do swear that the facts regarding the need for a continuance of the hearing of the hearing on Defendant's alternative motion for summary judgment set forth in paragraphs 14 to 17 above are true and correct to my personal knowledge.

_____
Barry R. Benton

SUBSCRIBED AND SWORN TO BEFORE ME by the said BARRY R. BENTON, to which witness my hand and seal of office on this the _13th_ day of October, 2003.

_____
Notary Public, State of Texas

_Leslie Delgado_
Notary's Name Printed:

_April 21, 2007_
My Commission Expires:

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the *13th* day of October, 2003, the foregoing Plaintiff's Response to Defendant's Motion to Dismiss and Motion for Continuance of Defendant's Motion for Summary Judgment was hand-delivered to counsel of record, to wit:

Ms. Nancy L. Masso                    *Via Hand-Delivery*
Assistant U.S. Attorney
600 E. Harrison St., No. 201
Brownsville, Texas 78522

BARRY R. BENTON

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| LUIS ALEJANDRO GARZA | * | |
| | * | |
| VS. | * | CIVIL ACTION NO. B-02-154 |
| | * | FEDERAL TORT CLAIMS ACT |
| THE UNITED STATES OF | * | |
| AMERICA | * | |

## ORDER

ON THIS DAY came on for consideration in the above-entitled and numbered cause Defendant's Motion to Dismiss under Rule 12 (b) (1) and (6), and after considering the pleadings and arguments of counsel, it is the opinion and order of the court that said motion should be denied.

IT IS THEREFORE ORDERED that the Defendant's motion to dismiss is denied.

IT IS FURTHER ORDERED that Plaintiff's motion for continuance of the hearing on Defendant's alternative motion for summary judgment is granted and Plaintiff's response to said motion, if any, shall now be filed on or before _____, 200__.

Signed _____, 2003 at Brownsville, Texas.

xc:   Mr. Barry R. Benton, (956) 546-9900
      Ms. Nancy L. Masso, (956) 548-2549

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

```
Exhibit
1
```

LUIS ALEJANDRO GARZA            *
                                *
VS.                             *    CIVIL ACTION NO. B-02-154
                                *
THE UNITED STATES OF AMERICA *

### AFFIDAVIT OF LUIS ALEJANDRO GARZA, PLAINTIFF

Before me, the undersigned authority this day personally appeared, Luis Alejandro Garza, known to me to be the person whose name is subscribed below and upon being duly sworn deposed and said:

"My name is Luis Alejandro Garza. I am the Plaintiff in the above-entitled and numbered cause. I am over the age of eighteen, of sound mind and competent in all respects to make this affidavit. The facts stated herein are based upon my personal knowledge.

"I am currently an inmate in the United States penitentiary in Pollock, Louisiana. I am serving a sentence for conspiracy to possess with intent to distribute cocaine. Prior to being transferred to Pollock, Louisiana I was confined in the United States Federal Correctional Institution located at Three Rivers, Texas.

About six months after arriving at Three Rivers, on February 6, 2001, I entered the recreational yard at 5:45 p.m. During the time I was in the recreational yard that day over two hundred inmates were in the recreational yard. I was in the yard for approximately an hour.

During that time I watched approximately seventy inmates gathering together over the course of _45_ minutes, first at the basketball court, and then moving to the handball court. During this time there was one guard on duty, Deborah Romero, and she was at the entrance gate. None was in the yard. It was odd that so many inmates were gathering together and not ordered to disburse as it was the usual custom and practice, from my personal observation, that the guards would require groups of inmates of more than five persons to separate. This is the same custom and practice at the Pollock facility.

Between 7:10 and 7:15 that evening, February 6, 2001, I was sitting on a stationary bike outside the fenced-in, weightlifting area, waiting for a guard to open the weightlifting area for me to enter so that I could do my job of organizing the weights. While waiting, the large group of inmates which had assembled at the handball court divided into two groups and started running. One of the groups ran at me. I was assaulted by these inmates and suffered, among other injuries, a fracture on the left side of my skull. I was later told that blood was coming out of my ears and I was projectile vomiting. I was airlifted to Spohn Hospital in Corpus Christi where emergency surgery was performed to release pressure on my brain. I now have lost significant hearing in my left ear. I have sharp pain in the left side of my jaw, which makes it difficult to eat, and every two to three days I have excruciating

headaches which last from eight to ten hours. My face swells every morning and I have a long scar on the side of my head, which is very visible with my short hair.

In the ten to fifteen minutes before I was attacked there was no officer patrolling the recreation yard. Had an officer been properly patrolling the area he or she would have noticed that a huge group had assembled and either ordered then to disburse or called for assistance. In all likelihood that would have prevented the beating which I and three other inmates suffered."

_____
LUIS ALEJANDRO GARZA


SUBSCRIBED AND SWORN TO BEFORE ME by the said LUIS ALEJANDRO GARZA, Affiant, to which witness my hand and seal of office on this the __23__ day of __September__, 2003.

_____
Notary Public, State of ~~Texas~~ Louisiana

SEAL:

__Sherry Rollins__
Notary's Name Printed:

__At Death__
My Commission Expires:

Exhibit
2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| LUIS ALEJANDRO GARZA | * | |
| | * | |
| VS. | * | CIVIL ACTION NO. B-02-154 |
| | * | FEDERAL TORT CLAIMS ACT |
| THE UNITED STATES OF | * | |
| AMERICA | * | |

### AFFIDAVIT OF BARRY R. BENTON ATTORNEY-IN-CHARGE
### PLAINTIFF LUIS ALEJANDRO GARZA

Before me, the undersigned authority, this day personally appeared BARRY R. BENTON, know to me to be the person whose name is subscribed below and upon being duly sworn, deposed and said:

" My name is Barry R. Benton. I am the attorney-in-charge for Luis Alejandro Garza, the Plaintiff in the above-entitled and numbered cause. I am of sound mind, over the age of 18, and competent in all respects to make this affidavit. The facts stated herein are based upon my personal knowledge.

"The statements and reports attached to this affidavit, Bates stamped numbers 000001 through 000050, are true and correct copies of documents produced by the Defendant, United States of America, in discovery in the above-entitled and numbered cause."

_(signature)_

**BARRY R. BENTON**

SUBSCRIBED AND SWORN TO BEFORE ME by the said BARRY R. BENTON, to which witness my hand and seal of office on this the _13th_ day of October, 2003.

Notary Public, State of Texas

Leslie Delgado
Notary's Name Printed:

April 21, 2007
My Commission Expires:

Page 3 of 3

**FCI THREE RIVERS**
**THREE RIVERS, TEXAS**

<u>DO NOT WRITE ON POST ORDERS</u>

SPECIFIC POST ORDERS FOR

**RECREATION PATROL**

**DUTY HOURS:**                         2:30 P.M. to 10:30 P.M.

**AREA OF RESPONSIBILITY:**        SECURITY OF FEDERAL INSTITUTION
            AND CAMP

**EQUIPMENT:**                         RADIO, KEY RING C-51, C-52, AND
                HANDCUFFS

2:30 PM        Report for duty in the prescribed uniform and report to the operations Lieutenant. Receive any pertinent information concerning the compound or your post. Proceed to the Control Center and draw key ring C-51 and C-52, a pair of handcuffs, and a radio. Proceed to the Metal Detector Station and conduct a test and inspection of the metal detector.

            Your post assignment is primary the recreation yard to provide direct supervision of inmates entering and exiting the recreation yard during movement and provide security coverage of the recreation yard during close movements. Announce to the Perimeter Patrols that you will be on the Yard. You will conduct test and inspection of the metal detector upon your arrival of duty.

            During mass inmate movements, you will ensure all inmates pass through the metal detector. Inmate wearing steel toe shoes will be required to remove their shoes prior to passing through the metal detector.

            During closed movement, you will patrol the recreation yard. You will monitor and inspect all security devices and be alert for any physical security concerns or weakness. Report all discrepancies and signs of abnormal inmate activities immediately to the operations lieutenant and/or the special investigation supervisor.

            The majority of your time will be spent monitoring inmate activities. You will

**SENSITIVE LIMITED OFFICIAL USE**
**January 3, 2000**

not be responsible for controlling inmate traffic to and from the secure weight lifting area.

## Page 1 of 3

In the event of an emergency, i.e., (body alarm, disturbance, etc.)  You are to remain in the recreation yard, ensuring the yard gate is secured, ceasing all inmate movement to and from the recreation yard, unless otherwise instructed by the shift supervisor.

3:30 PM    The recreation yard will be cleared of all inmates.  You will make security inspections of the recreation yard, perimeter fence, and conduct routine searches of the recreation yard.  In addition, you will use the "Garret GT 1000" hand-held metal detector to scan the ground surfaces for hidden weapons and contraband.

5:00 PM    After a good count has been established, proceed to the recreation gate.  The Operation Lieutenant will release inmates to the recreation yard, prior to feeding the evening meal to the general population. Inmates may enter the yard at this time, but will not leave until the last call for the evening meal.   Make frequent pat searches of inmates passing through your area.

5:55 PM    Upon completion of the evening meal, controlled movements will commence.  Monitor the inmates entering and exiting the recreation yard through the metal detector and conduct pat searches of selected inmates.  This will be period of high movement on the compound.  Be alert for inmates attempting to transport contraband to the recreation yard.

6:05 PM    Inmate movement will cease at this time, Continue your assigned duties and begin making watch calls to the Control Center Officer, via telephone extension 333.

6:55 PM    Open movement commences.  Monitor inmate activities on the recreation yard.

7:05 PM    Movement closed.  Monitor inmate activities on the recreation yard.

7:55 PM    Open movement commences.  Process inmates entering and exiting the recreation yard through the metal detector.

8:05 PM    Movement closed, monitor inmate activities on the recreation yard.

8:30 PM    The recreation yard is now closed for the evening.  Screen all inmates through the metal detector in preparation for the 9:30PM count.   Conduct a visual search of the recreation yard to ensure all inmates have exited.

**SENSITIVE LIMITED OFFICIAL USE**
**January 3, 2000**

After determining all inmates have been removed from the area, begin a search of the yard for contraband and hidden weapons by use of the hand-held metal detector. At the completion of your searches, conduct a security inspection of the perimeter fence. Make appropriate entries into the shakedown log book and security inspection report, which is secured in the office of the Recreation Specialist and Lieutenant's Office.

## Page 2 of 3

10:00 PM    Assist in the official count and the collection of count slips and outside door keys from all of the unit officers. Once you have collected all the count slips and unit keys, take them to the Control Center.

10:25 PM    Report to the Lieutenant's Office and Log in all area searches that you completed.

10:30 PM    Your tour of duty is complete. Turn in your keys and other equipment the Control Center.

NOTE:    These post orders are issued as a guideline for the officers assigned to this post, and are not intended to describe in detail all of the officers responsibilities. Good judgement and initiative are expected in all situations.

**DO NOT LEAVE YOUR POST WITHOUT THE APPROVAL OF THE WATCH SUPERVISOR OR UNTIL PROPER RELIEF HAS BEEN PROVIDED.**

_____
Larry Sandson,  Captain

**SENSITIVE LIMITED OFFICIAL USE**
**January 3, 2000**

Page 3 of 3
**FCI THREE RIVERS**
**THREE RIVERS, TEXAS**

<u>DO NOT WRITE ON POST ORDERS</u>

SPECIFIC POST ORDERS FOR

**RECREATION PATROL**

The primary responsibility of the Recreation Patrol Officer is to coordinate with the Shift Lieutenant and the Compound # 1 Officer for the supervision of inmate activity within all areas of the inner perimeter (i.e., gym, rec. yard, leisure center, etc.). The Recreation Patrol Officer will ensure all areas are covered. In the event of an emergency in any area of the institution, you must coordinate with the Recreation Staff to respond while ensuring that the Recreation Area is not left unsupervised. All activities, routine or otherwise, must be coordinated through the Shift Lieutenant and Recreation Staff.

**INMATE ACCOUNTABILITY**

As the Recreation Patrol Officer, with the assistance of the Recreation Staff you are responsible for maintaining accurate accountability of all inmates on the Recreation Yard. Coordinate with the Compound # 1 Officer for specific assignments during counts. All inmate movement ceases during any count.

It will be your responsibility in assisting the Compound #1 Officer to take all count slips from the compound to the Control Center. Coordinate with the other compound staff for their assistance. You should check each count slip and ensure that it is correct in format and has no markovers or corrections. Once you have collected all of the count slips and are satisfied that they are correct as stated above, turn them into the Control Center where they will be checked for accuracy.

**INMATE SUPERVISION**

The main objective of all BOP staff is the effective supervision of all inmates in whatever

**SENSITIVE LIMITED OFFICIAL USE**
**January 3, 2000**

000004

manner necessary. Staff should never over extend their vested authority, however use fair and impartial enforcement of all rules and regulations.

Page 1 of 5

As the Recreation Patrol Officer you are responsible for the supervision of inmates on the compound. Inmates should not be allowed to gather in large groups. Any movement of inmates after 10:00 PM must have the Shift Lieutenant's approval and all inmates must be escorted. Control and Mobile Officers are to be notified of the movement. Inmates being escorted from general population to the Special Housing Unit will be restrained from behind. All inmate traffic will pass through the metal detector.

## SECURITY INSPECTIONS/SEARCHES

One of the most effective techniques available to staff, for ensuring the security of the institution is maintained, is the conducting of daily security inspections and searches. This helps to combat escape attempts, the introduction of contraband, and increases the overall safety and sanitation of the institution. EVERY staff member is responsible for ensuring the security of the institution is maintained. All areas of the institution will have a security inspection conducted daily. Immediately report and document, on the appropriate security inspection report, any discrepancies found.

As the Recreation Patrol Officer you are responsible for assisting the Recreation Staff in the security of the entire Recreation area . You may be assigned to conduct security inspections of the perimeter fence.

## FENCE CHECK PROCEDURES

All zones are to be tested by using the hook on the pole to pull down on the fence to simulate someone climbing on it; then using the opposite end, rake across the fence to simulate someone attempting to cut the fence. These simple tests should activate the alarm be certain that you notify the Control Center prior to conducting the test, and communicate which zone you are getting ready to activate. You may want one of the perimeter patrol officers to help you by relaying messages for you to the Control Center. Each time you activate an alarm you must wait for the Control Center Officer to reset that alarm before you make another test. You will use the channel two frequency at all times when communicating with the Control Center while conducting the fence alarm zones tests.

**SENSITIVE LIMITED OFFICIAL USE**
**January 3, 2000**

A form will be maintained in the Control Center and shall be filled out completely with all pertinent information recorded. If malfunctions or security breaches are found, circle the area on the map and enter any other comments or explanations in the space provided.

All breaches or malfunctions will be reported to the Shift Lieutenant immediately.

## SEARCHES

When conducting searches, there are two (2) primary areas of concern: inmates and areas. The objective of searches is to detect contraband, prevent escapes, maintain institutional sanitation standards, and to eliminate fire and safety hazards.

Page 2 of 5

Inmates and their living, work, and leisure areas can be searched by staff without notice to or prior approval from the inmate and without the inmate's presence. Searches should be conducted routinely but at irregular times so as to not set a pattern.

## METHODS OF SEARCHING

### PAT SEARCHES

As the Recreation Patrol Officer, numerous pat searches are to be conducted on a routine basis. Pat searches are used more frequently than others. Inmates entering and departing the Recreation area should be searched periodically.

Any inmate observed acting suspiciously or observed carrying books, boxes, or any other article(s) not normally observed should also be searched.
(Refer to general post orders for pat search procedures)

### VISUAL SEARCHES (STRIP)

Visual searches may be conducted anytime staff believes the situation warrants (i.e., concealment of contraband, possession of narcotics or paraphernalia, or possession of weapons.

Strip searches must be conducted in a secluded area and by a staff member of the same sex. In cases of emergencies, staff members of the opposite sex may conduct strip searches. All strip searches must be documented in the Visual Search Log maintained in the Lieutenant's Office. (Refer to general post orders for strip search procedures)

### USE OF THE METAL DETECTOR

Metal detectors will be used on a routine basis. When using the walk through metal detector, the inmate will empty his pockets, placing all items on the inspection table. The inmate will then be instructed to pass through the metal detector. If the metal detector indicates a negative reading, the inmate's personal belongings will be inspected and returned. The officer will conduct random

**SENSITIVE LIMITED OFFICIAL USE**
**January 3, 2000**

pat searches of all inmates on an irregular basis.

If the metal detector indicates positive, the inmate will be instructed to submit to a pat search.

## RESPONDING TO EMERGENCIES

All emergencies (i.e., 222, body alarms, no-dial, fire alarms, etc.) will be responded to by all available staff. The Compound #1 Officer will be responsible for coordinating the response with the Shift Lieutenant. Under no circumstances will the Recreation area be left unsupervised, even during an emergency.

Page 3 of 5

## FIRE ALARMS

All fire alarms are to be considered actual. During the hours of 10:00 PM to 6:00 AM, the housing units will not be evacuated unless instructed to do so by the Shift Lieutenant. The source of the alarm will be determined and in the event evacuation is deemed necessary, all areas of the unit will be searched and cleared. Inmates from the evacuated unit will be assembled in the compound area between the units. During the hours of 6:00 AM to 10:00 PM, all inmates will be evacuated from the unit where the alarm was activated. In cases where there is an actual fire that threatens the safety of staff and/or inmates, the Shift Lieutenant will notify all concerned staff that the established fire emergency plan should be implemented.

## MEDICAL EMERGENCIES

The first staff member to arrive at the location of a medical emergency, involving either staff or inmate, will ensure the appropriate alarm is activated depending upon the seriousness of the emergency. The Duty Medical staff will be notified immediately and any initial instructions will be obtained from them. All staff should be available to render first aid (CPR, life saving techniques, etc.) until arrival of medical staff or the injured parties are transported to the hospital.

## ESCAPE ATTEMPTS

In the event that you observe an escape attempt in progress, immediately notify Control. Do not delay, time is of the essence and could mean the difference between a failed or successful escape.

Caution must be exercised in this situation. Do not attempt to physically restrain the inmate(s) unless you are sure of controlling the situation and have adequate staff assistance. Ensure the area where the escape attempt is occurring is cleared of all bystander and uninvolved inmates. Give verbal orders to the escapee(s) to cease or halt their actions. Do not rush up to the perimeter fence, as you could place yourself in the line of fire from the Mobile Officers should the use of firearms become necessary. The possibility also exists that the mobiles may not be able to visually identify you and you could be mistaken for an inmate.

**SENSITIVE LIMITED OFFICIAL USE**
**January 3, 2000**

## HELICOPTER ESCAPES

The possibility exists that an escape might be attempted by the use of a helicopter. This situation calls for extreme caution because the persons in the helicopter most likely will be armed. Obtain as much information as possible about the helicopter and passengers (i.e., color, markings, registration number, number of occupants, direction of travel, etc.). Instruct all inmates to clear the area and if at all possible, prevent the involvement of all others in the escape. Use good judgement and do not place yourself or others in any unnecessary jeopardy.

Page 4 of 5

## HOSTAGES

If a hostage situation occurs, under no circumstances will any inmate be allowed exit from the institution. Orders given by staff held under duress, regardless of rank or position, will not be followed.

_____
Larry Sandson, Captain

**SENSITIVE LIMITED OFFICIAL USE**
**January 3, 2000**

000008

**Page 5 of 5**

**SENSITIVE LIMITED OFFICIAL USE**
**January 3, 2000**

**FCI THREE RIVERS**
**THREE RIVERS, TEXAS**

<u>DO NOT WRITE ON POST ORDERS</u>

SPECIFIC POST ORDERS FOR

**RECREATION PATROL**

**DUTY HOURS:**                          6:00 A.M. to 2:30 P.M.

**AREA OF RESPONSIBILITY:**          SECURITY OF FEDERAL INSTITUTION
                     AND CAMP

**EQUIPMENT:**                          RADIO, KEY RING C-51, C-52, AND
                          HANDCUFFS

6:00 AM      Report for duty in the prescribed uniform and report to the Operations Lieutenant.
Receive any pertinent information concerning the compound or your post. Proceed to the
Control Center and draw key ring C-51 and C-52, a pair of handcuffs, and a radio.
Proceed to the Recreation metal detector station and conduct a test and inspection of the
metal detector.

Your post assignment is the recreation yard to provide direct supervision of
inmates entering and exiting the recreation yard during movement and provide
security coverage of the recreation yard during non movement periods. You will
test and inspect the metal detector upon your arrival of duty.

During inmate movement periods, you will ensure all inmates pass through the
metal detector. Inmates wearing steel toe shoes will be required to remove their
shoes prior to passing through the metal detector.

During non movement periods, you will patrol the recreation yard. Announce to
the Perimeter Patrols that you will be on the Yard. You will monitor and inspect
all security devices and be alert for any physical security concerns or weakness.
Report all discrepancies and signs of abnormal inmate activities immediately to
the Operations Lieutenant and/or the Special Investigation Supervisor.

The majority of your time will be spent monitoring inmate activities. You will
not be responsible for controlling inmate traffic to and from the secure weight
lifting area.

Page 1 of 3

**SENSITIVE LIMITED OFFICIAL USE**
**January 3, 2000**

In the event of an emergency, i.e., (body alarm, disturbance, etc.)  You are to remain in the recreation yard, ensuring the yard gate is secured, ceasing all inmate movement to and from the recreation yard, unless otherwise instructed by the shift supervisor.

7:00 AM    (Approximately) During the weekdays the dining hall will be closed at this time.

7:30 AM    (Approximately) During the weekends and holidays the dining hall will be closed at this time.

7:50 AM    The compound will now be closed for inmate movement.  All inmates will be either at their work detail, or in their assigned housing units.

8:25 AM    Assume supervision of the recreation yard as another period of inmate movement has just started.  Patrol the entire yard pat searching inmates.  Make rounds of the recreation and gym area. Be flexible.  You may be called upon to assume varying duties for the Activities Lieutenant.

8:35 A.M.    Compound will now be closed for inmate movement. Continue patrolling the Recreation area. These periods of 10 minute inmate movement will continue throughout the day.

9:30 A.M.    (WEEKENDS AND HOLIDAYS) Yard recall.  Ensure that all inmates return to their assigned areas in preparation for the 10:00am count.   Inform the Perimeter Patrols that the Rec. Yard is clear and you will be leaving the yard for count.

10:00 A.M.    Count on weekends and holidays will commence at this time.  You may be assigned an area to count and you also may be responsible for picking up count slips from units and details and taking them to Control Center.  Ensure that the count slips are in proper format and have no markovers or corrections.

10:30 A.M.    (Weekdays) Yard recall.

You will make security inspections of the recreation yard, perimeter fence, and conduct routine searches of the recreation yard.  In addition, you will use the "Garret GT 1000" hand-held metal detector to scan the ground surfaces for hidden weapons and contraband.

**SENSITIVE LIMITED OFFICIAL USE**
**January 3, 2000**

**Page 2 of 3**

12:00 PM    Upon completion of the noon meal, controlled movements will commence. Monitor the inmates entering and exiting the recreation yard through the metal detector and conduct random pat searches of inmates. This will be period of high movement on the compound. Be alert for inmates attempting to transport contraband to the recreation yard.

2:25 PM    Report to the Lieutenant's Office and log in all area searches that you completed.

2:30 PM    Your tour of duty is complete. Turn in your keys and other equipment the Control Center.

NOTE:    These post orders are issued as a guideline for the officers assigned to this post, and are not intended to describe in detail all of the officers responsibilities. Good judgement and initiative are expected in all situations.

DO NOT LEAVE YOUR POST WITHOUT THE APPROVAL OF THE WATCH SUPERVISOR OR UNTIL PROPER RELIEF HAS BEEN PROVIDED.

_____
Larry Sandson,  Captain

**SENSITIVE LIMITED OFFICIAL USE**
**January 3, 2000**

000012

BP-S288.052 **INCIDENT REPORT** C͞ ͞ ͟
MAY 1994
**U.S. DEPARTMENT OF JUSTICE**                              **FEDERAL BUREAU OF PRISC**

1. Name Of Institution:
   FCI THREE RIVERS, TEXAS
                    Part I - Incident Report

| 2. Name Of Inmate<br>Garcia-Becerra, Pedro | 3. Register Number<br>59771-065 | 4. Date Of Incident<br>February 06, 2001 | 5. Time<br>7:06 p.m. |
|---|---|---|---|
| 6. Place Of Incident<br>Recreation Yard | 7. Assignment<br>Unassigned | 8. Unit<br>Jim Wells | |

9. Incident Assaulting Another Person (Serious)                Code: 101

11. Description Of Incident (Date: 02-21-02 Time: 9:00 a.m. Staff become aware of incident)On February 21, 2002, at 9:00 a.m., an investigation was concluded.  This investigation clearly reveals inmate Garcia-Becerra #59771-065, assaulted inmate Castro-Ontiveros #25117-177, on February 06, 2001, at approximately 7:06 p.m., on the Recreation Yard near the weight cage.  This assault was part of an incident where several Border Brother gang members assaulted members and associates of the Texas Syndicate prison gang.  A video tape of this incident clearly revealed inmate Garcia-Becerra and several other inmates assaulting inmate Castro-Ontiveros by striking him with their fists and kicking him.  Castro-Ontiveros sustained severe head trauma as a result of the incident.

| 12. Signature Of Reporting Employee | Date And Time<br>02-21-02<br>9:30 a.m. | 13. Name And Title (Printed)<br>R. Webster, Special Investigative<br>Supervisor | |
|---|---|---|---|
| 14. Incident Report Delivered To Above Inmate By | | 15. Date Incident<br>Report Delivered | 16.time Incident<br>Report Delivered |

                    Part II - Committee Action

17. Comments Of Inmate To Committee Regarding Above Incident



| 18. A. It Is The Finding Of The Committee That You:<br>_____ Committed The Following Prohibited Act.<br><br>_____ Did Not Commit A Prohibited Act. | B. _____ The Committee Is Referring The Charge(s) To The DHO For Further Hearing.<br>C. _____ The Committee Advised The Inmate Of Its Finding And Of The Right To File An Appeal Within 15 Calendar Days. |
|---|---|

19. Committee Decision Is Based On The Following Information


20. Committee action and/or recommendation if referred to DHO (Contingent upon DHO finding inmate committed prohibited act)


21. Date And Time Of Action _____ (The UDC Chairman's Signature Next To His Name Certifies Who Sat On The UDC And That The Completed Report Accurately Reflects The UDC Proceedings.)

**000013**

Chairman (Typed Name/signature)    Member (Typed Name)    Member (Typed Name)

‾ ͟ ͟ ͞Cͫ ͟ ͟ ͟ Cͫ ͟ ͟ ͟ ͟ File Record:  Copy - DHO;  Copy - Inmate After UDC Action;  Copy -



**UNITED STA   S GOVERNMENT**
**MEMORANDUM**
**FEDERAL BUREAU OF PRISONS**
**F.C.I. THREE RIVERS TX. PO BOX 4000**

**DATE:** February 07, 2001

**REPLY TO:** D. Romero, Recreation Specialist (detail for training)

**SUBJECT:** Assault On Inmates

**TO:** Lt. Rannefield

On February 06, 2001, at approximately 7:10 PM, I Recreation Specialist Romero, while at the metal detector monitoring inmate traffic entering/exiting the recreation yard during the open compound. After completing the 7:00 PM move, I was en route back to the recreation yard when the incident occurred. I witness inmate Martinez #71774-079, running from the inside patio area past the recreation corridor gate being chased by an undetermined amount of inmates behind him. Inmate Martinez, fell to the ground in a fetal position outside the recreation corridor gate. Mr Martin notified control by radio and I ran to lock the recreation corridor gate. I witness inmate Castro, Francisco #07170-081 and another unknown inmate assaulting inmate Martinez. The unknown inmate ran back inside the patio area after striking inmate Martinez with a closed fist several times. Inmate Castro #07170-081 continued to assault inmate Martinez with his closed fist, kicking him several times, then ran back inside the patio area. I yelled at inmate Castro to stop but he did not comply. I was attempting to lock the recreation corridor gate while an undermined amount of inmates were pushing the gate for inmate Castro #07170-081 to run back inside the patio area after assaulting inmate Martinez.

There was an inmate Maldonado, Tomas #02691-079, begging me to let him out before I locked the gate, he stated "their gonna get me." I allowed Maldonado #02691-079 access through the corridor gate then locked the gate with the assistance of Mr Martin. We waited for additional staff to arrive before proceeding inside the patio area. There was an undetermined amount of inmates running around in the patio area.

When additional staff arrived I proceeded to the outside recreation area where I encountered inmate Castro, Felipe #25117-177 laying unconscious, outside the weight pile with facial injuries. I also observed inmate Garza, Luis #92434-079, he had been assaulted he was walking from behind the sit up benches located outside the wellness area. I was telling inmate Garza to sit down but he was incoherent, his entire left side of his face was swollen, bloody and was unable to walk without assistance. The medical staff arrived inmates had to be carried out on stretchers.

000014



U.S. Department of Justice

Federal Bureau of Prisons

Three Rivers, Texas 87071

February 7, 2001

MEMORANDUM TO: H. Allen Beard, Jr., Captain

FROM:                    R. Webster, Lieutenant

SUBJECT:                 Assault in Recreation

On February 7, 2001, at approximately 7:10 p.m., Recreation Staff observed a large number of Hispanic inmates grouped together and running near the boccie ball court. Upon responding to the area, they discovered inmate Castro-Ontiveros, Felipe #25117-177 on the ground from an apparent assault. Inmate Garza, Luis #92434-079, was also found laying on the ground near the bocci ball court area. Both inmates appeared to have sustained head injuries. Inmates Garza and Castro were escorted to Health Services and subsequently transported to Spohn Hospital, Beeville, by ambulance. Responding staff conducted a census of all inmates in the Recreation Yard, video taping each inmate. Both inmates were examined by ER personnel and airlifted to Spohn Corpus Cristi Hospital for further treatment. Inmates Jaime, Jose #89539-079 and Martinez-Orozco, Jesus #71774-079, were also found to have injuries. _____ indicate inmate Garza was struck in the head by a bocci ball. Initial investigation revealed several, up to 40, inmates of the _____ assaulted _____. The following is a list of chronological events:

| | |
|---|---|
| 7:10 pm: | Staff call for assistance at Recreation. |
| 7:15 pm: | Control Calls 911 for ambulances to be dispatched to the institution to transport inmates Castro and Garza to Spohn Hospital, Beeville. |
| 7:30 pm: | Institution look-down is initiated. |
| 8:00 pm: | SIS staff and Captain arrive at the institution. Census is conducted of all inmates on the Recreation Yard. Recreation Yard is secured as a crime scene. |
| 8:05 pm: | Inmate Castro departs the institution via ambulance. |
| 8:18 pm: | Inmate Garza departs the institution via ambulance. |
| 8:35 pm: | Warden arrives at institution. Inmates identified as _____ on the Recreation Yard are placed in the Special Housing Unit. |
| 9:15 pm: | Mass interviews are initiated. |



UNITED STATES GOVERNMENT MEMORANDUM
FEDERAL BUREAU OF PRISONS
FEDERAL CORRECTIONAL INSTITUTION
P.O. BOX 9000
THREE RIVERS, TX 78071

DATE: 02-07-01

Reply TO ATTN OF: D. Esparza, Senior Officer Specialist

SUBJECT: Fight on recreation yard

TO: J. Rannefeld, Operations Lieutenant


On 02-06-01 at approximately 7:09 p.m. Willie Martin, Recreation Specialist called for assistance on the recreation yard. Stating that there was a fight between gangs. As this was occurring this reporting officer was stationary on the berm overlooking the recreation yard in the outside permeter vehicle # 2. I was unable to observe the altercation due to my view being blocked by the hand ball court walls. Immediately staff requested medical staff. Upon arrival of J. Rannefeld, Operations Lieutenant at approximately 7:11 p.m. he requested local EMS. Two inmates were then taken to medical. Local local EMS arrived at approximately 7:24 p.m. Later at appproximately 8:30p.m. both inmates were transported by local EMS to an outside hospital.

000016

Page2
Protective Custody
I-0678

## WITNESS INTERVIEWS

On February 10, 2001, at 9:00 a.m., the SIS Office conducted an interview with inmate Coleman #76988-079. Inmate Coleman provided the following statement: I was playing basketball on the outdoor basketball court. Fifty ⟨　　　　　　⟩started running from the handball court. One inmate got hit with a pipe or something. Another inmate by the weight cage got seriously assaulted. I ran towards the indoor basketball area as the(　　　　　　)were behind me. I thought they were after us, (　　　　　　)? A little bald headed inmate got hit with a pipe or something near the large gates near the officers station. About six inmates jumped him.

Inmate Coleman was provided a photograph spread sheet and provided the following information. Inmate Coleman stated inmate Hernandez Mendez #50118-079, was the first inmate to assault inmate Castro by the weight cage. He stated he observed inmate Acosta-Licea by the handball court, but did not see him fighting. Coleman stated he observed inmate Marrufo-Ortiz assaulting inmate Castro by the weight pile by hitting with a bocci ball. Inmate Acuna was observed assaulting inmate Castro by the weight pile. Inmate Giles-Rodriguez was observed assaulting inmate Castro also. Inmate Coleman stated he observed inmate Garcia-Becerra digging a knife out of the dirt before the assault occurred. He stated he observed inmate Benitez-Dominguez also digging in the dirt looking for a knife. Coleman said inmate Garcia-Aguilar assaulted inmate Garza near the ice machine.

On February 10, 2001, at 9:20 a.m., the SIS Office conducted an interview with inmate Frazier #46222-079. Inmate Frazier provided the following statement: i was working out near the pull up bars. Several Mexican inmates started running around, so I made my way up front to get out of the way of things. I did not see any inmates fighting with weapons. I don't know who they were after, but there were two Mexican inmates hauled out of the Recreation Yard on stretchers.

On February 10, 2001, at 9:40 a.m., the SIS Office conducted an interview with inmate Garcia #04163-180. Inmate Garcia made the following statement: I was at the bocci ball court when I saw people running from the handball court. There were a bunch of Mexican inmates fighting. I could not recognize who was fighting because there were so many of them. Some of the inmates grabbed bocci balls and took into the fight. I would not want to testify in court.

Page3
Protective Custody
I-0678

On February 10, 2001, at 9:45 a.m., the SIS Office conducted an interview with inmate Gaytan #54862-198. Inmate Gaytan stated the(_____)got word a week ago about an assault on (_____)by the(_____)(_____)and(_____)in Leavenworth. Inmate Gaytan said the(_____)gang members did not back up the(_____) on their assault on the Texas Syndicate.

On February 10, 2001, at 9:50 a.m., the SIS Office conducted an interview with inmate Hammons #29501-077. Inmate Hammons provided the following statement: I was playing bocci ball with another inmate on the bocci ball court closest to the weight cage. I saw hordes of Mexican inmates running my way from the handball court. Half of them went around the weight cage and trapped two guys. Thirty to fourty of them attacked one guy playing dominoes. He got up and started knocking them down. He made his way to the inside basketball court for more room. Another inmate grabbed a bocci ball and ran towards the inmate getting assaulted by the wall near the bikes. He threw the bocci ball at his head. I could not recognize him. One inmate got hit with a red water jug. The water jug ended up near the soccer field. One inmate from Jim Wells A was leading the group assaulting one inmate. (Inmate Castro). Another inmate involved had a(_____) (_____)tattoo on his neck. It appeared the(_____)jumped the(_____) I don't know why it happened, the(_____)don't run anything on the yard. I think the(_____) (_____)would get hurt if they returned to the compound. People don't like what they did to the

On February 10, 2001, at 9:50 a.m., the SIS Office conducted an interview with inmate Hodges #09177-035. Hodges provided the following statement: I was in the weight cage working out when I heard people running. I saw a large group of Mexican inmates running. Half of them went towards the bocci ball court, half went around the weight cage like it was planned. ..........

On March 7, 2001, at 11:40 a.m., the SIS Office conducted an interview with inmate Brock #10471-035. Inmate Brock was provided a photograph spread sheet for identifying inmates. Brock made the following statement: I was sitting on the bleachers when I saw a large group of Mexican inmates by the handball court. One guy, (Castro) was being assaulted by several inmates. Inmate Lopez-Lopez #03511-188, was striking him with a water cooler. The cooler was bluish green with a white top. Inmate Castro-Guzman #07170-081, was kicking inmate Castro. Inmate Giles-Rodriguez #07267-081, was kicking inmate Castro. Inmates De Jesus Flores #11799-051, and ..#45..were also involved in the assault.

On March 7, 2001, at 10:00 a.m., the SIS Office conducted an interview with inmate Alvarez #62648-080. Inmate Alvarez provided the following statement: I went to the Recreation Yard at 7:00 p.m., and went to use the restroom when I saw several inmates fighting. I could not recognize the inmates fighting, nor would I identify them. I saw one inmate by the first name of "Jesus", on the ground being assaulted by about ten inmates.

On March 7, 2001, at 11:00 a.m., the SIS Office conducted an interview with inmate Cabrera #93405-079. Inmate Cabrera provided the following statement: I was lifting weights when I saw a group of inmates walk towards the handball court. They came back with even more inmates. About twenty to thirty inmates come running from behind the weight cage and started kicking an inmate by the bicicles. He covered up on the ground as they were kicking him. One inmate was

hitting him with a red cooler.  I think the cooler was left out there by the track.  During the assault, one guy came back to the one on the ground and hit him in the face with a bocci ball.  He picked up the ball and struck the guy on the ground again in the head.  The guy with the bocci ball said, "Thats what you get for messing with _____.  I then saw several inmates kicking an inmate by the wall near the bicicles.

| | INFLICTED WOUNDS ON SELF/OTHERS |
|---|---|
| | ENFORCEMENT OF INSTITUTION REGULATIONS |
| | PREVENTION OF A CRIME |
| | APPREHENSION OF ONE WHO HAS COMMITTED A CRIME |
| | OTHER (SPECIFY) | |

**LIST FULL NAME OF ALL PRINCIPLE STAFF INVOLVED IN INCIDENT**

**CONFRONTATION AVOIDANCE STAFF (NAME AND TITLE) -- PRESS ENTER AFTER EACH NAME/TITLE**

**FORCE CELL TEAM MEMBERS, IF USED (NAME AND TITLE) -- PRESS ENTER AFTER EACH NAME/TITLE**

**WAS THE INCIDENT VIDEOTAPED SEQUENTIALLY AS OUTLINED IN THE CORRECTIONAL SERVICES MANUAL?  (YES/NO)**

**IF NO, EXPLAIN WHY NOT, AND INDICATE AT WHAT POINT TAPING DID BEGIN.**

**INDICATE TAPE ECN (EVIDENCE CONTROL #)**

**SECTION 6: DESCRIPTION OF INCIDENT**

DESCRIPTION OF INCIDENT (IF USE OF FORCE, INCLUDE DETAILS, SUCH AS NAME OF THE SUPERVISOR APPLYING THE CHEMICAL AGENT AND/OR RESTRAINTS, REASONS FOR USE OF HARD RESTRAINTS INSTEAD OF SOFT RESTRAINTS, ETC.

On February 6, 2001 at approximately 7:06 p.m., Recreation Yard staff observed a commotion and several inmates running near the Bocci ball/Weight cage area.  Upon responding, they observed inmate Castro-Ontiveros, Felipe #25117-177, lying on the ground bleeding from head injuries.  Inmate Garza, Luis #92434-079, was also found nearby, lying on the ground bleeding from head injuries.  Responding staff secured the Recreation Yard and transported inmates Garza and Castro-Ontiveros to the Health Services Unit.  Medical staff conducted injury assessments on both inmates and determined they sustained severe head trauma. Both inmates were transported to Spohn Beeville Hospital by ambulance for treatment and were subsequently airlifted to Spohn Memorial Hospital, Corpus Christi, for further treatment.  A census was conducted of all inmates on the Recreation Yard and checked for injuries.  Inmates Jaime, Jose #89539-079, and Martinez-Orosco, Jesus #71774-079, both Texas Syndicate members , were found to have facial injuries.  They were examined by medical staff and placed in the Special Housing Unit.  Preliminary investigation revealed at least 40 Border Brother gang members assaulted inmates Garza, Castro-Ontiveros, Jaime and Martinez-Orosco.  The assault was a result of Border Brother gang members attacking Texas Syndicate gang members.  The institution was locked down and additional staff recalled to the institution.  All identified Border Brother gang members and associates were placed in the Special Housing Unit.  All identified Texas Syndicate gang members and associates were also placed in the Special Housing Unit.  The FBI was notified and responded to the institution at approximately 10:00 p.m.  The institution remains on lock down status pending further investigation.

ROUTING:        REGION/REGIONAL DIRECTOR; REGION/CORR SVCS; BOP-DIR/DIRECTOR;
                BOP-CPD/CORR SVCS 583S AND 586S; BOP-HSD/ASSISTANT DIRECTOR

ILE:        CAPTAIN; INMATE CENTRAL FILE

**U.S. DEPARTMENT OF JUSTICE**
**Federal Bureau of Prisons**

P.S. 1380.05
August 1, 1995
Attachment N, Page 1

FCI _Three Rivers_
INSTITUTION

MAGS INTERVIEW FORM

Interview of Inmate: _Williams, Corey_  Reg. No. _76893-079_  Unit/Cell _KB-124_

Detail: _Kitchen_  Topic of Interview: _____

Place of Interview: _Kares Unit Center Office_

Date & Time of Interview: _2-7-01_  _12:04 pm_

1. Do you know the victim? _NO_  From where? _____

   Did you see him/her today? _____  If so, when? _____  Where? _____

   With whom? _____

   By what name do you know the victim? _____

2. Where were you at the time of the incident? _Recreation Yard around 6 pm to 8 p_

   What were you doing? _Playing basketball_

   How long had you been there? _Since 6:00 pm._

   Who saw you in the area? _Other Inmates_

3. What do you know about the incident? (Explain): _I just saw people_
   _Crowding up so I got out of the way._

4. Do you know what happened? (Explain): _NO, I went to the_
   _front gate._

5. Did you see the weapon? (Describe): _No_

6. What have you been told about the incident? (By whom?): _Nothing_

000021

**U.S. DEPARTMENT OF JUSTICE**
**Federal Bureau of Prisons**

P.S. 1380.05
August 1, 1995
Attachment N, Page 2

7.    Name of the alleged assailant(s): _Don't know_

Name: _____    Reg. No. _____ Unit _____

Nickname: _____    Assignment: _____

Race: _____  Age: _____    Height: _____  Weight: _____

Color of Hair: _____    Color of Eyes: _____

Clothing Worn: _____

Any other descriptive identifying marks, scars, tattoos, etc.? _____

_____

_____

8.    A detailed account of your activities/location for two hours prior to discovery of the victim:

_I was playing basketball._

9.    If you knew anything about the incident would you tell us?   Yes ___✓___   No _____

10.    Is there anything else we should be asking you?      Yes _____   No ___✓___

_____

_____

11.    Is there anything else you wish to tell us?   no  Yes _____   No _____

_____

_____

12.    Interviewers comments: _____

_____

_____

_____

Name of Interviewer: _RICHARD C. BARRERA_    Witness: _____
                          (Print)                                  (Print)

_____    _____
      (Signature)                    (Signature)
       CSW
         (Title)                       (Title)

12:02

000022

**U.S. DEPARTMENT OF JUSTICE**
**Federal Bureau of Prisons**

**P.S. 1380.05**
**August 1, 1995**
**Attachment N; Page 1**

_JCI TRV_
INSTITUTION

MASS INTERVIEW FORM

Interview of Inmate: _Alford, Robert_   Reg. No. _02020-081_   Unit/Cell _94u_

Detail: _Compound_   Topic of Interview: _Assault 2-6-01_

Place of Interview: _Lw office_

Date & Time of Interview: _104_

1.   Do you know the victim? _no_   From where? _____

     Did you see him/her today? _____   If so, when? _____   Where? _____

     With whom? _____

     By what name do you know the victim? _____

2.   Where were you at the time of the incident? _coming back from the yard._

     What were you doing? _____

     How long had you been there? _____

     Who saw you in the area? _____

3.   What do you know about the incident? (Explain): _no_

     _____

     _____

4.   Do you know what happened? (Explain): _no_

     _____

     _____

5.   Did you see the weapon? (Describe): _no_

     _____

     _____

6.   What have you been told about the incident? (By whom?): _nothing_

     _____

     _____

000023

U.S. DEPARTMENT OF JUSTICE
Federal Bureau of Prisons

P.S. 1380.05
August 1, 1995
Attachment N, Page 2

Name of the alleged assailant(s): _____

Name: _____ Reg. No. _____ Unit _____

Nickname: _____ Assignment: _____

Race: _____ Age: _____ Height: _____ Weight: _____

Color of Hair: _____ Color of Eyes: _____

Clothing Worn: _____

Any other descriptive identifying marks, scars, tattoos, etc.? _____

_____

_____

A detailed account of your activities/location for two hours prior to discovery of the victim:

_____

_____

_____

If you knew anything about the incident would you tell us? Yes _____ No _____

Is there anything else we should be asking you? Yes _____ No _____

_____

_____

Is there anything else you wish to tell us? Yes _____ No _____

_____

_____

Interviewers comments: _He said he felt something was going_
_to happen but he left at good recall._

_____

_____

Interviewer: _J W Parker_
(Print)                           Witness: _____ (Print)

_J W P____ (Signature)           _____ (Signature)

_____ (Title)                    _____ (Title)

Interview Ended: _10 42_

000024

**U.S. DEPARTMENT OF JUSTICE**
**Federal Bureau of Prisons**

P.S. 1380.05
August 1, 1995
Attachment N, Page 1

FCT TRV

INSTITUTION

MASS INTERVIEW FORM

Interview of Inmate: _Gomez_    Reg. No. _05760-0__ Unit/Cell _McNA / 117_

Detail: _ORD MAT_    Topic of Interview: _Fight Rec Yard_

Place of Interview: _Mese A_    _Beaumont_

Date & Time of Interview: _2-7-01   236_

1.  Do you know the victim? _____ From where? _____

    Did you see him/her today? _____ If so, when? _____ Where? _____

    With whom? _____

    By what name do you know the victim? _____

2.  Where were you at the time of the incident? _On Rec Yard from 6°°Am to 7°°Pm on_

    What were you doing? _Left Yard at 7°Pm - inmate states he could_ TRA

    How long had you been there? _sell a crowd of people at back of houphe_

    Who saw you in the area? _Court says you could tell something was going o._

    _with the TS, 2 inmates were talking to about 15 min_
    _Could I Deatify Picture of inmates_

3.  What do you know about the incident? (Explain): _Nothing_

    _____
    _____

4.  Do you know what happened? (Explain): _____

    _____
    _____

5.  Did you see the weapon? (Describe): _____

    _____

6.  What have you been told about the incident? (By whom?): _Nothing_

    _____

_1 his inmate says He can Identify inmates._

000025

U.S. DEPARTMENT OF JUSTICE                                    P.S. 1380.05
Federal Bureau of Prisons                                   August 1, 1995
                                                         Attachment N, Page 2

---

7.      Name of the alleged assailant(s): _____

        Name: _____ Reg. No. _____ Unit _____

        Nickname: _____ Assignment: _____

        Race: _____ Age: _____ Height: _____ Weight: _____

        Color of Hair: _____ Color of Eyes: _____

        Clothing Worn: _____

        Any other descriptive identifying marks, scars, tattoos, etc.? _____

        _____

        _____


8.      A detailed account of your activities/location for two hours prior to discovery of the victim:

        _____

        _____

        _____


9.      If you knew anything about the incident would you tell us?  Yes __✓__    No _____


10.     Is there anything else we should be asking you?        Yes _____    No __✓__

        _____

        _____


11.     Is there anything else you wish to tell us?           Yes _____    No _____

        _____

        _____


12.     Interviewers comments: _____

        _____

        _____

        _____


Name of Interviewer: _BROWN_____          Witness: _____
                         (Print)                          (Print)

                     _Brown_____                 _____
                        (Signature)                    (Signature)

                     _Counsellor__                 _____
                         (Title)                        (Title)


Time Interview Ended: _____  _____

000026

**U.S. DEPARTMENT OF JUSTICE**
**Federal Bureau of Prisons**

P.S. 1380.05
August 1, 1995
Attachment N, Page 1

*FCI Three Rivers*
INSTITUTION

MASS INTERVIEW FORM

Interview of Inmate: *Hammons*  Reg. No. *29501-077*  Unit/Cell *JWA/296 0*

Detail: *Facilities/Plumb* Topic of Interview: *Disturbance/Rec yard*

Place of Interview: *Counselors Office/JWA*

Date & Time of Interview: *2-6-01*

1.  Do you know the victim? _____ From where? _____

    Did you see him/her today? _____ If so, when? _____ Where? _____

    With whom? _____

    By what name do you know the victim? _____

2.  Where were you at the time of the incident? *bocci court*
    What were you doing? *playing bocci ball with Purdue (20)*
    How long had you been there? *through the whole thing*
    Who saw you in the area? _____

3.  What do you know about the incident? (Explain): *bocci court - about 80 mexicans jumped on 3 mexicans - I got out of the way, we went by the horseshoe pit. The bailey brothers were doing the work. I saw one (the one in front of the weight cage) They hit him in the head with a bocci ball.*

4.  Do you know what happened? (Explain): _____

5.  Did you see the weapon? (Describe): *One got smacked with a red water jug. that ended up by the soccer field.*

6.  What have you been told about the incident? (By whom?): _____

000027

*tell plis guy – bal' head (Identified Castro Guzman) – they attacked one had BB tetored under his right ear te guy by the tables*

**U.S. DEPARTMENT OF JUSTICE**
**Federal Bureau of Prisons**

P.S. 1380.05
August 1, 1995
Attachment N, Page 2

---

7.    Name of the alleged assailant(s): _____

Name: _____ Reg. No. _____ Unit _____

Nickname: _____ Assignment: _____

Race: _____ Age: _____ Height: _____ Weight: _____

Color of Hair: _____ Color of Eyes: _____

Clothing Worn: _____

Any other descriptive identifying marks, scars, tattoos, etc.? _____

_____

_____


8.    A detailed account of your activities/location for two hours prior to discovery of the victim:

_____

_____

_____


9.    If you know anything about the incident would you tell us?   Yes ___✓___   No _____


10.   Is there anything else we should be asking you?   Yes _____   No ___✓___

_____

_____


1.    Is there anything else you wish to tell us?   Yes _____   No _____

___ *it was* _____

_____

Interviewers comments: *I/m Galego #90252-079 looks like a guy they tried to get over where they play cards – he fought about 15 off – (Probably Jaime, they look alike) Castro-Guzman was leading the pack*


of Interviewer: **M. ANDERSON**
                    _____(Print)_____

                    _____(Signature)_____

                    LT
                    _____(Title)_____

Witness: _____
         _____(Print)_____

         _____(Signature)_____

         _____(Title)_____

000028

Coleman
76988-079

Karnes.
here 2½ yrs.
18 months to go. Drugs.
No gangs.                    would Testify in Court.
Playing basket ball - outdoor.
saw Essays go to handball court. - "BB" over 30.
I saw one hit one with pipe or something
Saw guy by weight cage gate get fucked up.

I ran towards Indoor Basket ball they were behind us,
    thought they were after us.
-    Little Bald headed dude got hit with a pipe
     or something at Office gates (metal) going into Rec.
     about six jumped him
-    Guy by weight cage, one guy hit him, others
     started kicking him.
-    One guy lived in 218 K-B was 1st one to
     hit guy by weight cage
-    didn't see others getting hit.
-    Can identify others by picture.
-    BB's hit TS
            nad Club - cooler

            1st to hit guy by cage
Saw - Acosti By handball court. didn't see fighting.
    as
      assaulting guy by ice machine w/ ball
      ran b/me hitting guy by weight file
      ...ht file - assaulting

000029

**U.S. DEPARTMENT OF JUSTICE**
**Federal Bureau of Prisons**

P.S. 1380.05
August 1, 1995
Attachment N, Page 1

*Arrived at the Institution a week and a half ago.*

TRV

_____
**INSTITUTION**

KOL-125

**MASS INTERVIEW FORM**

Interview of Inmate: _Cabrera-Pris_ Reg. No. _93465-079_ Unit/Cell _K-A 112_

Detail: _Unassign_ Topic of Interview: _Assault_          FS/A1

Place of Interview: _Karnes Center Office_

Date & Time of Interview: _2/6/01 10:45 PM_

1. Do you know the victim? _NO_ From where? _____

   Did you see him/her today? _____ If so, when? _____ Where? _____

   With whom? _____  *N/A*

   By what name do you know the victim? _____

2. Where were you at the time of the incident? _Weight Pile_

   What were you doing? _Lifting Weights_

   How long had you been there? _45 minutes_

   Who saw you in the area? _A Lot of people_

3. What do you know about the incident? (Explain): _30-40 inmates jumped two inmates. Don't Fuck With "La Raza" The crew it means. they said_

4. Do you know what happened? (Explain): _I saw them kick him in the upper torso and head area. They threw the ball at the guy very hard - striking him in the head_

5. Did you see the weapon? (Describe): _Yes, I did._

   _____

   _____

6. What have you been told about the incident? (By whom?): _I was there._

   _____

   _____

000030

**U.S. DEPARTMENT OF JUSTICE**
**Federal Bureau of Prisons**

P.S. 1380.05
August 1, 1995
Attachment N, Page 2

7.  Name of the alleged assailant(s): _____ *No* _____

   Name: _____ Reg. No. _____ Unit _____

   Nickname: _____ Assignment: _____

   Race: _____ Age: _____ Weight: _____ Weight: _____

   Color of Hair: _____ Color of Eyes: _____

   Clothing Worn: _____

   Any other descriptive identifying marks, scars, tattoos, etc.? _____
   _____
   _____

8.  A detailed account of your activities/location for two hours prior to discovery of the victim:
   _____
   _____
   _____

9.  If you knew anything about the incident would you tell us? Yes __✓__     No _____

10. Is there anything else we should be asking you?     Yes _____     No __✓__
   _____
   _____

11. Is there anything else you wish to tell us?     Yes __✓__     No _____
   _____
   _____

2.  Interviewers comments: _____
   _____
   _____
   _____

me of Interviewer: _____ *Neal* _____          Witness: _____
              (Print)                                    (Print)

   _____                              _____
      (Signature)                                     (Signature)

   _____                              _____
       (Title)                                         (Title)

000031

Cabrera    93405.079    ∠A    K01-125
FS/AM

Was lifting weights when he saw
a large group of inmates (blacks, mexican
white) walking back & forth outside
weight lifting cage & ab machines. He
observed numerous (more than 30) inmates
hitting inmate with water jugs, (Bca) bocci ball
& kicking. inmates were not useing
fists they were kicking & throwing objects
at the victim. Inmate Cabrera feels
fingerprints may be found on ball.

000032

Cabrera
93405-079
3-701
1/11 (Reg)

K-A.
here month
9 yrs to go.
was lifting weights
20-30 people running from behind
weight cage. went to handball court 1st came
back w/ more of them. started kicking
guy by bicicles he went down. by
weight cage door. covered up.
Saw one guy w red cooler, cooler
was left near corner of cage, moved
out towards track.
One guy came back, threw bucci ball
down on to guys face, right side near chin.
bad guy grabs ball again, hits him
in head. guy said "thats what
you get for messing w/ La Raza!"
Then I saw them kicking guy by wall.

U.S. DEPARTMENT OF JUSTICE
Federal Bureau of Prisons

P.S. 1380.05
August 1, 1995
Attachment N, Page 1

*Beaver, Dedrick*
*03018-180*

**TRV**
_____ INSTITUTION

*K03-096*

**MASS INTERVIEW FORM**

Interview of Inmate: *Broch, Damione* Reg. No. *10471-035* Unit/Cell *127u*

Detail: _____ Topic of Interview: _____

Place of Interview: _____

Date & Time of Interview: _____

1.  Do you know the victim? _____ From where? _____

    Did you see him/her today? _____ If so, when? _____ Where? _____

    With whom? _____

    By what name do you know the victim? _____

2.  Where were you at the time of the incident? _____

    What were you doing? _____

    How long had you been there? _____

    Who saw you in the area? _____

3.  What do you know about the incident? (Explain): *I was sitting on the bleachers when it kicked off. About 50 or 60 hispanics started grouping up. Then the fight started by the cage. One hispanic was getting the shit kicked out of him*

4.  Do you know what happened? (Explain): *by about 20 or so others. He looked dead to me. I did not ~~know~~ know anyone, I heard they were BB's.*

5.  Did you see the weapon? (Describe): _____

    _____

    _____

6.  What have you been told about the incident? (By whom?): _____

    _____

    _____

000034

S. DEPARTMENT OF JUSTIC                          1380.05
eral Bureau of Prisons                      August 1, 1995
                                         Attachment N, Page 2

Name of the alleged assailant(s): _____

Name: _____ Reg. No. _____ Unit _____

Nickname: _____ Assignment: _____

Race: _____ Age: _____ Height: _____ Weight: _____

Color of Hair: _____ Color of Eyes: _____

Clothing Worn: _____

Any other descriptive identifying marks, scars, tattoos, etc.? _____

_____

_____


A detailed account of your activities/location for two hours prior to discovery of the victim:

_____

_____

_____


If you knew anything about the incident would you tell us?  Yes _____  No _____


Is there anything else we should be asking you?      Yes _____  No _____

_____

_____


Is there anything else you wish to tell us?        Yes _____  No _____

_____

_____


Interviewers comments: _____

_____

_____

_____

Interviewer: _____   Witness: _____
                        (Print)                              (Print)

             _____            _____
                      (Signature)                        (Signature)

             _____            _____
                       (Title)                             (Title)

                                                              000035

terview Ended: _____

Brock
1047I-035
3 7-01
11:40 AM

K-B.

here 4 months
130 months to go.
Drug trafficing.
Was sitting on Bleachers, went out
right after chow. w/beaver
saw large grp of mex by hardball
court. Saw them assault one guy
saw other guy after fight.
Saw guy by cage getting stomped, hit
w/ water jug.
identified #21   #30
    was hitting guy w/water cooler
w/white top, blush green base.
    was kicking along w/rest of them.
    Kicking by cage
    also in mix.

000036

**U.S. DEPARTMENT OF JUSTICE**
**Federal Bureau of Prisons**

P.S. 1380.05
August 1, 1995
Attachment N, Page 1

FCI TRV
INSTITUTION

## MASS INTERVIEW FORM

Interview of Inmate: Diaz-Alvarez, S. Reg. No. 83514-080 Unit/Cell: 98U

Detail: Ord MCA    Topic of Interview: Assault

Place of Interview: MCA

Date & Time of Interview: 2/7/01  1237

1.    Do you know the victim? _____ From where? _____
      Did you see him/her today? _____ If so, when? _____ Where? _____
      With whom? _____
      By what name do you know the victim? _____

2.    Where were you at the time of the incident? Walking on track
      What were you doing? Walking
      How long had you been there? 5:45 pm until lockdown
      Who saw you in the area? no one

3.    What do you know about the incident? (Explain): I saw a bunch
      of people on the basketball
      court. mostly Hispanics

4.    Do you know what happened? (Explain): I think somebody
      fight

5.    Did you see the weapon? (Describe): no

6.    What have you been told about the incident? (By whom?): no one told
      me nothing

000037

U.S. DEPARTMENT OF JUSTICE

Federal Bureau of Prisons

P.S. 1380.05
August 1, 1995
Attachment N, Page 2

7. Name of the alleged assailant(s): Don't Know

Name: _____ Reg. No. _____ Unit _____

Nickname: _____ Assignment: _____

Race: _____ Age: _____ Height: _____ Weight: _____

Color of Hair: _____ Color of Eyes: _____

Clothing Worn: _____

Any other descriptive identifying marks, scars, tattoos, etc.? _____

8. A detailed account of your activities/location for two hours prior to discovery of the victim:

@ 5:00 pm I was in the Chit. then I went to chow then I come back to the unit & went to the track

9. If you knew anything about the incident would you tell us? Yes _____ No ✓

10. Is there anything else we should be asking you? Yes _____ No ✓

11. Is there anything else you wish to tell us? Yes _____ No ✓

12. Interviewer's comments: Piedras Negras, MX denies gang ties

Name of Interviewer: K Heritage          Witness: _____
                    (Print)                         (Print)

_____                         _____
                    (Signature)                     (Signature)

_____                         _____
                    (Title)                         (Title)

000038

**U.S. DEPARTMENT OF JUSTICE**
**Federal Bureau of Prisons**

P.S. 1380.05
August 1, 1995
Attachment N, Page 1

_FCI TRV_
INSTITUTION

MASS INTERVIEW FORM

Interview of Inmate: _Diaz Sergio_    Reg. No. _83514 086_    Unit/Cell _MA-98_

Detail: _Unit Orderly_    Topic of Interview: _____

Place of Interview: _MCM Unit_

Date & Time of Interview: _2-06-01    10:45_

1.  Do you know the victim? _____ From where? _____
    Did you see him/her today? _____ If so, when? _____ Where? _____
    With whom? _____
    By what name do you know the victim? _____

2.  Where were you at the time of the incident? _Rec Yard on the track_
    What were you doing? _Since 5:30 pm, Walking_
    How long had you been there? _____
    Who saw you in the area? _____

3.  What do you know about the incident? (Explain): _I was walking & I saw them gathering at basketball court_

4.  Do you know what happened? (Explain): _Fight_

5.  Did you see the weapon? (Describe): _No_

6.  What have you been told about the incident? (By whom?): _That there was a fight_

000039

**U.S. DEPARTMENT OF JUSTICE**
**Federal Bureau of Prisons**

**P.S. 1380.05**
**August 1, 1995**
**Attachment N, Page 2**

7.   Name of the alleged assailant(s): _Dont Know Who was iNvolve_

Name: _____ Reg. No. _____ Unit _____

Nickname: _____ Assignment: _____

Race: _____ Age: _____ Height: _____ Weight: _____

Color of Hair: _____ Color of Eyes: _____

Clothing Worn: _____

Any other descriptive identifying marks, scars, tattoos, etc.? _____

_____

_____

8.   A detailed account of your activities/location for two hours prior to discovery of the victim:
_Went to eat & then Went to_
_walk @ track._

_____

9.   If you knew anything about the incident would you tell us?   Yes __✓__   No _____

10.   Is there anything else we should be asking you?   Yes _____   No __✓__

_____

_____

11.   Is there anything else you wish to tell us?   Yes _____   No __✓__

_____

_____

12.   Interviewers comments: _____

_____

_____

_____

Name of Interviewer: _Millie Guajardo_ Witness: _____
                     (Print)                        (Print)

_Millie Guajardo_                      _____
                     (Signature)                    (Signature)

_____                        _____
      (Title)                                (Title)

_10:50 am._

000040

U.S. DEPARTMENT OF JUSTICE
Federal Bureau of Prisons

P.S. 1380.0[_]
August 1, 1995
Attachment M, Page 1

INSTITUTION
**MASS INTERVIEW FORM**

Interview of Inmate: **Frazier**

Detail: **Med Ofc**                    Reg. No. **46222-079**   Unit/Cell **LOB/208**

Place of Interview: **Food Service**   Topic of Interview: **Disturbance on Rec Yard**

Date & Time of Interview: **2-6-01 / 2156**

1. Do you know the victim?                          From where?
   Did you see him/her today?
   With whom?                                       If so, when?
   By what means do you know the victim?            Where?

2. Where were you at the time of the incident? **at the pullup/dip bars in rec**
   What were you doing? **pull + out of the way**
   How long had you been there? **just came out of pullup, pile and on my**
   Who saw you in the area? **way to the door**

3. What do you know about the incident? (Explain): **About 25-30-40 hispanics**
   **Saw the sled valt before it broke**                    (Mex.-?)
   **forming to get out of the way.** **it − broke pile = people start[.]**

4. Do you know what happened (Explain): **No, didn't hear what**
   **happened**

5. Did you see the weapon? (Describe): **No**

6. What have you been told about the incident? (By whom): **No one**

**U.S. DEPARTMENT OF JUSTICE**
**Federal Bureau of Prisons**

P.S. 1380.05
August 1, 1995
Attachment N, Page 2

7.     Name of the alleged assailant(s): _____

Name: _____     Reg. No. _____     Unit _____

Nickname: _____     Assignment: _____

Race: _____     Age: _____     Height: _____     Weight: _____

Color of Hair: _____     Color of Eyes: _____

Clothing Worn: _____

Any other descriptive identifying marks, scars, tattoos, etc.?

8.     A detailed account of your activities/location for two hours prior to discovery of the victim:

9.     If you knew anything about the incident would you tell us?     Yes _____ No _____

10.    Is there anything else we should be asking you?     Yes _____ No _____

11.    Is there anything else you wish to tell us?     Yes _____ No _____

12.    Interviewer comments:

Name of Interviewer: M. ANDERSON
                     (Print)
Signature: _____
           (Signature)
           (Title)

Witness: _____
         (Print)
         (Signature)
         (Title)

Time Interview Ended: 2200

000042

Z

**U.S. DEPARTMENT OF JUSTICE**
**Federal Bureau of Prisons**

P.S. 1380.05
August 1, 1995
Attachment N, Page 1

FCI 3 Rivers
**INSTITUTION**

**MASS INTERVIEW FORM**

Interview of Inmate: Hodges    Reg. No. 09177-035   Unit/Cell JWA / 206 L

Detail: HVAC    Topic of Interview: Disturbance / Rec yard

Place of Interview: Counselors Office / JWA

Date & Time of Interview: 2-6-01    2331

1.  Do you know the victim? _____ From where? _____

    Did you see him/her today? _____ If so, when? _____ Where? _____

    With whom? _____

    By what name do you know the victim? _____

2.  Where were you at the time of the incident? Weight pile

    What were you doing? lifting weights

    How long had you been there? from rec move until the CO took us out

    Who saw you in the area? _____

eating
hall
? of by
? guy

→ Skinny guy (little, long hair) - painting shop with Manny - that is
his red color, he was beating the guy.

3.  What do you know about the incident? (Explain): Identified Reyes # 76756-079 was
beating the guy in front of the cage. There were about 70, they
split into 2 groups and surrounded two guys - The guy by the
weight pile was being kicked, he stood up and took a swing,
then got hit w/ a bocci ball.

4.  Do you know what happened? (Explain): The inmates took off by the
baseball diamond when the CO's came.

5.  Did you see the weapon? (Describe): I saw the last guy that ran
off when the CO came - he was the one that
hit the dude with a bocci ball.
the

6.  What have you been told about the incident? (By whom?): _____

    _____

The group split up and surrounded the two guys
in front of the weight pile. The one guy split
?? ?? went to the ?? tables.

000043

**U.S. DEPARTMENT OF JUSTICE**
**Federal Bureau of Prisons**

P.S. 1380.05
August 1, 1995
Attachment N, Page 2

7.    Name of the alleged assailant(s): _____

     Name: _____ Reg. No. _____ Unit _____

     Nickname: _____ Assignment: _____

     Race: _____ Age: _____ Height: _____ Weight: _____

     Color of Hair: _____ Color of Eyes: _____

     Clothing Worn: _____

     Any other descriptive identifying marks, scars, tattoos, etc.? _____

     _____

     _____

8.    A detailed account of your activities/location for two hours prior to discovery of the victim:

9.    If you knew anything about the incident would you tell us?  Yes _____    No _____

10.   Is there anything else we should be asking you?      Yes _____    No _____

11.   Is there anything else you wish to tell us?      Yes _____    No _____

12.   Interviewers comments: _____

Name of Interviewer: M. ANDERSON (Print)      Witness: _____ (Print)

_____ (Signature)      _____ (Signature)

LT (Title)      _____ (Title)

000044

Time Interview Ended:

**U.S. DEPARTMENT OF JUSTICE**
**Federal Bureau of Prisons**

**P.S. 1380.05**
**August 1, 1995**
**Attachment N, Page 1**

FCI TRV
_____
INSTITUTION

MASS INTERVIEW FORM

Interview of Inmate: Ghznan P.    Reg. No. 86842-079    Unit/Cell JhA.

Detail? Recreation AM    Topic of Interview: Fight in Regard

Place of Interview: JhA

Date & Time of Interview: 2-6-01   1123pm

1.  Do you know the victim? N    From where? _____
    Did you see him/her today? _____ If so, when? _____ Where? _____
    With whom? _____
    By what name do you know the victim? _____

2.  Where were you at the time of the incident? AT THE Rec yard by
    What were you doing? the gate waiting
    How long had you been there? 10 minute
    Who saw you in the area? Ms. Ronero, Rec staff

3.  What do you know about the incident? (Explain) nothing, I Just Herd
    Ms. Ronero Radio going off

4.  Do you know what happened? (Explain): NO.

5.  Did you see the weapon? (Describe): NO

6.  What have you been told about the incident? (By whom?): I Just Heard the
    Noise

**U.S. DEPARTMENT OF JUSTICE**
**Federal Bureau of Prisons**

P.S. 1380.05
August 1, 1995
Attachment N, Page 2

7.    Name of the alleged assailant(s): _____

   Name: _____ Reg. No. _____ Unit _____

   Nickname: _____ Assignment: _____

   Race: _____ Age: _____ Height: _____ Weight: _____

   Color of Hair: _____ Color of Eyes: _____

   Clothing Worn: _____

   Any other descriptive identifying marks, scars, tattoos, etc.? _____

   _____

   _____

8.    A detailed account of your activities/location for two hours prior to discovery of the victim:

   _____

   _____

   _____

9.    If you knew anything about the incident would you tell us?  Yes ___✓___  No _____

10.   Is there anything else we should be asking you?  Yes _____  No ___✓___

   _____

   _____

11.   Is there anything else you wish to tell us?  Yes _____  No ___✓___

   _____

12.   Interviewers comments: _Inmate states He heard the_
_Traffic over, MR. Romero Radio And_
_stayed still_

Name of Interviewer: _D Rio_
           (Print)

           (Signature)

           (Title)

Witness: _____
           (Print)

           (Signature)

           (Title)

Time Interview Ended: _11/21 am_

000046

U.S. DEPARTMENT OF JUSTICE
Federal Bureau of Prisons

P.S. 1380.05
August 1, 1995
Attachment N, Page 1

FCI TRV
INSTITUTION

## MASS INTERVIEW FORM

Interview of Inmate: Richardson, LD   Reg. No. 23567-077   Unit/Cell: 125U

Detail: Ord   Topic of Interview: Assault

Place of Interview: MCB

Date & Time of Interview: 2/7/01   1050

1. Do you know the victim? No   From where?
   Did you see him/her today? _____ If so, when? _____ Where? _____
   With whom? _____
   By what name do you know the victim? _____

2. Where were you at the time of the incident? on Rec Yard
   What were you doing? in the Gym watching basketball
   How long had you been there? about 5 min after move
   Who saw you in the area? person

3. What do you know about the incident? (Explain): Nothing

4. Do you know what happened? (Explain): I saw a couple of guys on a stretcher

5. Did you see the weapon? (Describe): No

6. What have you been told about the incident? (By whom?): It could have been prevented if an off had been in the area (weight racks)

000047

**U.S. DEPARTMENT OF JUSTICE**
**Federal Bureau of Prisons**

P.S. 1380.05
August 1, 1995
Attachment N, Page 2

7.    Name of the alleged assailant(s): NA

Name: _____    Reg. No. _____    Unit _____

Nickname: _____    Assignment: _____

Race: _____    Age: _____    Height: _____    Weight: _____

Color of Hair: _____    Color of Eyes: _____

Clothing Worn: _____

Any other descriptive identifying marks, scars, tattoos, etc.? _____

_____

8.    A detailed account of your activities/location for the hours prior to discovery of the victim:
I was in the unit watching
TV in sports room - basketball

9.    If you knew anything about the incident would you tell us? Yes ✓    No

10.   Is there anything else we should be asking you?    Yes    No ✓

11.   Is there anything else you wish to tell us?    Yes    No ✓

12.   Interviewers comments: _____ has no
gang ties

e of Interviewer: K Heritage                    Witness:
                  (Print)                                (Print)
              K Heritage
                  (Signature)                           (Signature)
                  (Title)                                (Title)

Interview Ended: 1055

000048

**U.S. DEPARTMENT OF JUSTICE**
**Federal Bureau of Prisons**

P.S. 1380.05
August 1, 1995
Attachment N, Page 1

FCT TRU
INSTITUTION

MOI-120

## MASS INTERVIEW FORM

Interview of Inmate: Haynes, G   Reg. No. 08346-005 Unit/Cell: 120L

Detail: ~~Facilities~~   Topic of Interview: _____ Plumbing

Place of Interview: MCA

Date & Time of Interview: 2/7/01   3:00pm

1.   Do you know the victim? NO   From where? _____

Did you see him/her today? _____ If so, when? _____ Where? _____

With whom? _____

By what name do you know the victim? _____

2.   Where were you at the time of the incident? Weight Cage

What were you doing? Sime, rea, ndrs,

How long had you been there? lifting weights

Who saw you in the area? Ranged Lt  2 guys out of
TW Farris d_____

3.   What do you know about the incident? (Explain): We were J&B
in the weight cage. No staff
around & the fight lasted a good
5-10 minutes

4.   Do you know what happened? (Explain): bunch of guys got
in a fight.

5.   Did you see the weapon? (Describe): NO   I saw Lt.
Brown Kick a boochie ball

6.   What have you been told about the incident? (By whom?): nothing
_____
_____

000049

**U.S. DEPARTMENT OF JUSTICE**
**Federal Bureau of Prisons**

P.S. 1380.05
August 1, 1995
Attachment N, Page 2

7.   Name of the alleged assailant(s): _don't Know_

   Name: _____

   Reg. No. _____ Unit _____

   Nickname: _____ Assignment: _____

   Race: _____ Age: _____ Height: _____ Weight: _____

   Color of Hair: _____ Color of Eyes: _____

   Clothing Worn: _____

   Any other descriptive identifying marks, scars, tattoos, etc.? _____
   _____
   _____

8.   A detailed account of your activities/location for two hours prior to discovery of the victim:
   _went to the rec yard, on_
   _the rec move ,_
   _____

9.   If you knew anything about the incident would you tell us?   Yes _____   No ✓

10.  Is there anything else we should be asking you?   Yes _____   No ✓
   _____
   _____

   Is there anything else you wish to tell us?   Yes _____   No ✓
   _____

   Interviewers comments: _Longview, TX denies_
   _gang ties,_
   _____
   _____

   of Interviewer: _K Heritage_
                      (Print)
   _____   (Signature)
   _CSW_
           (Title)

   Witness: _____
                (Print)
   _____   (Signature)
   _____   (Title)

   Interview Ended: _3°5/6m_

000050