IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| LUIS ALEJANDRO GARZA, | § § § § § § § § § | |
| Plaintiff, | | |
| v. | | CIVIL ACTION NO. B-02-154 |
| UNITED STATES OF AMERICA, | | |
| Defendant. | | |

United States District Court
Southern District of Texas
ENTERED

MAR - 9 2007

Michael N. Milby, Clerk of Court
By Deputy Clerk

## OPINION & ORDER

BE IT REMEMBERED that on March ___, 2007, the Court **ENTERED** the following findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52(a).

I.   **Factual and Procedural Background**

On July 26, 2002, Plaintiff Luis Alejandro Garza filed suit in this Court under the Federal Tort Claims Act, 28 U.S.C. § 2671 ("FTCA"), for injuries he sustained while a prisoner at the Federal Correctional Institution in Three Rivers, Texas. Dkt. No. 1, at 2; Dkt. No. 26, Ex. 1, at 2. On or about February 6, 2001, Plaintiff was attacked and severely beaten by multiple inmates while he was in the recreation yard of the correctional facility. Dkt. No. 26, Ex. 1, at 2–3. At the time Plaintiff filed suit, he alleged that the negligence of the Bureau of Prison employees proximately caused the injuries he sustained because the patrol guard on duty, Debra Romero, was not patrolling the recreation yard, contrary to Specific Post Orders. *Id.* at 3. Specifically, Plaintiff averred that: (1) the Government failed to keep him free from harm pursuant to 18 U.S.C. § 4042 and the 8th Amendment of the U.S. Constitution, (2) Romero failed to follow the post order prohibiting large groups from gathering, and (3) Romero failed to follow the "will patrol" order instructing her to patrol the recreation yard. Dkt. No. 26, Ex. 1, at 6–7.

In September 2003, the Government filed a Motion to Dismiss, or in the alternative,

for Summary Judgment. Dkt. No. 18. The matter was then referred to a Magistrate Court for a Report and Recommendation. On September 28, 2004, this Court dismissed the Plaintiff's complaint, finding that his claims against the Government fell within the discretionary function exception of the FTCA, found at 28 U.S.C. § 2680(a), thereby protecting the Government from liability. Dkt. No. 39. Plaintiff appealed the Court's ruling following the dismissal.

In December 2005, the Fifth Circuit Court reversed the dismissal and remanded the case for a full factual determination on the merits regarding any claim based on the failure of the guard to follow the "will patrol" instruction in the Specific Post Orders. Garza v. United States of America, 161 Fed. Appx. 341, 346 (5th Cir. 2005); Dkt. No. 49, at 9–10. The Fifth Circuit Court agreed with this Court's dismissal of Plaintiff's claims that the Government breached a duty to keep him safe pursuant to 18 U.S.C. § 4042 and the 8th Amendment, and it agreed with "the dismissal of any claim based solely on . . . [Romero's] failure to properly assess and break up the inmate group" that attacked Plaintiff. Id. However, the court reversed the dismissal because "the 'will patrol' instruction prescribes a set course of action for the post guard, [and therefore] the discretionary function exception does not bar a cause of action based on Garza's allegation that Romero failed to patrol the recreational yard." Id. The court also noted that

> [t]o the extent that [Plaintiff] is able to prove his allegations that Romero failed to patrol the yard . . . her failure to even notice the group, rather than her alleged failure to properly assess its size and potential danger, is the issue. That failure, along with the failure to immediately report any "abnormal inmate activities," is actionable under the "will patrol" directive, which . . . falls outside of the discretionary function exception.

Garza, 161 Fed. Appx. at 345–346; Dkt. No. 49, at 8.

Following remand, the parties resumed discovery proceedings. The non-jury trial of this case commenced on November 29, 2006 and concluded on December 4, 2006. Having heard the testimony of the parties and examined the admitted exhibits, the Court makes the following Findings of Fact and Conclusions of Law.

## II.     Findings of Fact

1. On February 6, 2001, Plaintiff Luis Alejandro Garza was a prisoner in custody at the Federal Correctional Institution in Three Rivers, Texas. The Three Rivers facility includes a recreation yard that encompasses approximately five to seven acres. The yard consists of an outdoor recreation area, a Leisure Center, and a recreation office. The outdoor recreation area includes basketball courts, a bocci ball area, an enclosed weight training area (referred to as the "weight cage" or "weight pile"), a running track, a football field, and a baseball field. Gov't Ex. 1. The Leisure Center is an enclosed area where inmates may participate in various activities. *Id.* The recreation office is a separate, enclosed building that is partly used as a storage facility for recreation equipment. In order to gain access to the outdoor recreation area and all other areas which make up the yard, all inmates must pass through a metal detector. *Id.* The configuration of the metal detector, the Leisure Center, the recreation office, and the outdoor area of the yard is such that there is no clear line of vision from the metal detector to the outdoor yard. On February 6, 2001, there were approximately 300 to 500 inmates in the recreation yard.

2. Although correctional staff members at the Three Rivers facility each have specific occupations, all employees of every type including, for example, secretarial staff, are to respond to an emergency situation and attempt to regain control of the institution.

3. Correctional staff members who work in the recreation yard are Recreation Patrol Officers and Recreation Specialists. These two positions are distinct from one another, as each involves different primary duties.

4. The Specific Post Orders for Recreation Patrol dictate the duties of a Recreation Patrol Officer ("Patrol Officer"). Plaintiff Ex. 16. The Specific Post Orders both describe the general duties and objectives of the position, and include a detailed set of instructions that Patrol Officers must follow at precise times throughout their shift. *Id.* The Patrol Officers' duties involve maintaining accurate accountability of inmates in the recreation

yard, conducting security inspections and searches, performing fence check procedures, and operating metal detectors. *Id.* at 4–6. Furthermore, Patrol Officers are instructed that "[i]nmates should not be allowed to gather in large groups." *Id.* at 5. The Orders also provide that "[i]n the event of an emergency in any area of the institution, you must coordinate with the Recreation Staff to respond while ensuring that the Recreation Area is not left unsupervised." *Id.* at 4. The detailed set of instructions include specific duties to perform at particular times throughout the hours of duty. *Id.* at 1. One such instruction dictates that "[the Patrol Officer's] assignment is primary [sic] the recreation yard to provide direct supervision of inmates entering and exiting the recreation yard during [open] movement and provide security coverage of the recreation yard during close[d] movements." *Id.* at 1. Additionally, "[d]uring closed movement, [a Patrol Officer] will patrol the recreation yard." *Id.* Furthermore, "[t]he majority of [a Patrol Officer's] time will be spent monitoring inmate activities." *Id.*

5.  The official duties of a Recreation Specialist ("Specialist") are provided in a Memorandum of Recreation Duties distributed to all Recreation Staff on March 14, 1997. Gov't Ex. 2, Att. A, at 1. The Memorandum was in effect on the date of the incident at issue. Gov't Ex. 2, at 1. In contrast to the duties of a Recreation Patrol Officer, a Recreation Specialist is responsible for maintaining the recreation grounds, providing equipment, and creating programs for the inmates at the correctional facility, as well as supervising the recreation yard. Gov't Ex. 2, Att. A, at 1. Although Specialists primarily provide inmates with recreation activities so that the inmates may use their time productively, Specialists also oversee the Leisure Center, supervise intramural and varsity sports programs, coordinate holiday activities, and manage the inmate camp. *Id.* at 2–6. During an evening shift, a Specialist also supervises "all activities in the Recreation yard to include intramural, hobby shop, weight pile, music programs and sanitation of the area." *Id.* at 6–7.

6.  Specialists are required to patrol the recreation yard. They must supervise inmates in the yard and maintain inmate accountability. *Id.* at 1. During periods of mass inmate

movement,[1] a Specialist must "ensure all inmates pass through the metal detector [and] [i]nmates wearing steel toed shoes will be required to remove their shoes prior to passing through the metal detector." *Id.* at 2. Specialists must also be familiar with all Bureau of Prison policies concerning security. *Id.* at 1.

7.  Thus, Recreation Specialists' duties are both recreational and supervisory. When a Specialist fulfills recreational duties, such as retrieving sports equipment from the recreation office that is located within the recreation yard, the result may be that the yard is left unsupervised for a short period of time. This is an acceptable practice so long as the overall safety of the yard is not jeopardized.[2] However, a Specialist's supervisory duties must be executed in a reasonable manner considering all the conditions then existing. Thus, because the recreation yard encompasses such a large area and includes the Leisure Center building, a Specialist must be mobile around all areas of the yard in order to ensure that no portion of the yard is left unsupervised, especially in the absence of Recreation Patrol Officers.

8.  Supervising inmate activity in the recreation yard is a visual, aural, and intuitive task. The recreation yard is an area of the Three Rivers facility where violence is likely to occur, and certain indicators or aggravating factors sometimes precede violence in the yard. These indicators include a reduced noise level in the yard, an unusually high number of inmates wearing their standard-issue steel-toed boots instead of their sneakers, groups of rival gangs amassing, intramural teams not appearing for their scheduled games, and religious groups of inmates not appearing in the recreation yard. However, although these

---

[1] "Open movement" describes the period of time from five minutes before the top of the hour until five minutes after the top of the hour, during which inmates may enter and exit the recreation yard. "Closed movement" refers to the remaining period of time in the hour during which inmates may not enter or exit the recreation yard.

[2] Based on his experience as a recreation supervisor, Assistant Recreation Supervisor Joseph Humme "wouldn't have a problem" with a Specialist retrieving equipment from the recreation office and leaving the yard unsupervised, so long as the Specialist used his or her best personal judgment.

indicators may precede violent outbreaks, fights may erupt without any escalating tension preceding them.

9.      The evaluation of these factors and whether they foreshadow a violent outbreak is a highly subjective process. If inmate groups begin to form, a correctional officer evaluates whether there are aggravating factors present that indicate the group may become violent. If an inmate group's purpose is benign, then the group is left alone. If violent, aggravating factors are evident, asking inmates for their identification cards commonly causes the inmates to disperse.

10.     During the evening of February 6, 2001, there were only two prison employees working directly in the recreation yard. Willie Martin, a Recreation Specialist, was on duty in the Leisure Center of the recreation yard during the evening shift, from 12:30 p.m. to approximately 9:00 p.m. Debra Romero, also a Recreation Specialist, was on duty in the recreation yard during the evening shift, from 12:30 p.m. to approximately 8:30 p.m. or 9:00 p.m. Joseph Humme was the Assistant Recreation Supervisor on duty at the time of the incident that led to this lawsuit, but he was not on supervisory duty directly in the recreation yard. At that time, Supervisor Humme had been employed as a supervisor for approximately five years.

11.     In addition to Recreation Specialists, there are typically two Recreation Patrol Officers on duty in the recreation yard to patrol the area and supervise inmate behavior. However, there were no Recreation Patrol Officers on duty in the recreation yard on February 6, 2001. On that date, the special housing/segregation unit of the Three Rivers facility was under construction, and a portion of the general population unit was being used to house the inmates assigned to the special housing/segregation unit. To alleviate the difficulties associated with these logistical changes, the Recreation Patrol Officers normally on duty in the recreation yard had been reassigned to assist with transporting the special housing/segregation inmates from their cells to the shower units. Although there were no Recreation Parol Officers on duty in the recreation yard on the evening in question, it was

Specialist Romero's understanding that she was not required to assume the duties of the Recreation Patrol Officers. Instead, she understood that her duties remain unchanged, such that her recreation duties were paramount to her patrol and supervisory duties, even under the conditions as they existed.

12. On February 6, 2001, Plaintiff entered the recreation yard at approximately 5:50 p.m. and proceeded to walk along the track in the yard. He observed a group of inmates gathered by the uncovered basketball court and a group of inmates gathered by the handball courts. At approximately 6:50 p.m. or 6:55 p.m., he moved to the stationary bicycle area outside of the weight cage. Plaintiff remained in that area until approximately 7:08 p.m., when he was physically attacked by a large number of inmates. Plaintiff did not see any correctional staff members in the recreation yard throughout his time in the yard.

13. Anibal Cabrera Piris, an inmate currently in federal custody, was in the recreation yard of the Three Rivers facility on February 6, 2001. Specialist Romero let him into the weight cage, which was kept locked, at approximately 45 minutes to 1 hour before the violence occurred. He witnessed the assault on Plaintiff, which occurred just outside the weight cage, and he saw that Specialist Romero was one of the first correctional staff members to aid Plaintiff after he was assaulted. Mr. Piris also sensed escalating tension in the yard that evening.

14. Alfonso Martinez Moreno, an inmate currently in federal custody, was also present in the recreation yard on February 6, 2001. Specialist Romero let him into the locked weight cage area at approximately 50 minutes to 1 hour and 10 minutes before the assault on Plaintiff occurred. While he was in the weight cage, he witnessed groups of inmates gathering near the basketball and handball courts for about 20 to 30 minutes before the violence occurred. He sensed that it was an unusually quiet day and that the attack on Plaintiff happened very quickly.

15. Myron Coleman was an inmate in custody at the correctional facility in Three Rivers

on February 6, 2001, and he was present in the recreation yard when the incident in question occurred. When he entered the recreation area, Specialist Romero was at the metal detector. Mr. Coleman was at the uncovered basketball court about 45 minutes before the violence occurred, and he witnessed a group of approximately 30 inmates gathering near the handball court during that time. When he saw the assault begin, he managed to leave the area where the violence occurred, and he exited the recreation yard just as Specialists Martin and Romero were closing the gate to the yard in order to contain the inmates in the yard.

16.   Robert Hammons, an federal inmate presently in custody, was being housed at the correctional facility in Three Rivers on February 6, 2001 and was in the recreation yard when the incident at issue occurred. He was in the bocci ball area of the yard, and he witnessed groups of inmates gathering around 5:45 p.m. He saw Specialist Romero walk around the recreation yard at approximately 6:15 p.m. or 6:20 p.m., but he did not see her after that time. He also sensed something was amiss in the environment that evening.

17.   Prior to some, but not all, of the previous instances when inmate violence had erupted, Specialist Romero had been warned by inmates that violence was about to occur. However, on February 6, 2001, no inmates or other witnesses notified Specialist Romero that there was a likely possibility of violence, despite their observations of inmate groups gathering prior to the assault.

18.   In his experience as a Recreation Specialist, when Specialist Martin observed a group of approximately 20 or more inmates, he would typically walk up to the group and tell the inmates to disperse. If the group was very large, he or another staff member on duty would normally notify an operation lieutenant to advise him or her of the situation. Additionally, Specialist Martin regularly looked out for predictors of violence in the recreation yard, such as a high number of inmates wearing their steel-toed boots in the yard.

19.  While on duty in the Leisure Center of the recreation yard on February 6, 2001, Specialist Martin was operating the metal detector and monitoring the inmates as they entered the yard. On that date, he did not observe an unusually high number of inmates wearing their steel-toed boots while entering the recreation yard. When the attack on Plaintiff occurred at 7:08 p.m., Specialist Martin observed inmate violence and was also alerted by Specialist Romero that violence was occurring. Specialist Martin called for additional staff assistance and helped Specialist Romero close the large grill door to the recreation yard in order to prevent the violence from spreading outside of the yard.

20.  During her 16 years of experience as a correctional staff member, Specialist Romero observed groups of inmates form in the recreation yard for a number of benign reasons, such as resolving gang problems or gathering for religious reasons. If she observed groups of inmates but no other aggravating factors were present in the environment, such as the groups belonging to rival gangs, then it was her practice not to order the groups to disperse.

21.  While on duty in the recreation yard on February 6, 2001, Specialist Romero unlocked the weight cage at approximately 6:45 p.m. or 6:50 p.m. That evening, she did not see any large groups of inmates forming prior to the assault on Plaintiff. Additionally, Specialist Romero did not sense any escalating tension, nor did she observe any other aggravating factors, such as an inordinate number of inmates wearing their steel-toed boots, that might have indicated violence was likely to occur that evening. At approximately 7:05 or 7:10 p.m., Specialist Romero was at the metal detector at the entrance to the recreation yard monitoring inmates as they entered and exited the yard during the 7:00 p.m. open movement period. Plaintiff's Ex. 24, at 1.[3] However, only one

---

[3] Plaintiff's Ex. 24 is a memorandum from Specialist Romero to a superior officer submitted the day after the incident in question, in which Specialist Romero describes her actions near the time of the assault on Plaintiff. However, at trial Specialist Romero testified that she briefly walked over to the metal detector to speak to Specialist Martin at approximately 7:05 p.m. and that she was returning to the outdoor area of the recreation yard when she noticed that inmate violence was occurring.

staff member is typically needed to properly operate the metal detector. After the completion of the open movement period, Specialist Romero walked from the metal detector toward the outdoor area of the yard. *Id.* At that time, she saw an inmate run toward the large grill door of the yard, and he was being chased by other inmates. She alerted Specialist Martin that inmate violence was occurring, and she and Specialist Martin attempted to contain the inmates in the yard by closing the grill door. When Specialist Romero went toward the area where Plaintiff had been attacked, inmates were scattering away from that area. Specialist Romero assisted Plaintiff and called for additional staff assistance.

22.   After the assault, Plaintiff received preliminary medical care at the Three Rivers facility, and he was subsequently transported to a hospital in Corpus Christi, Texas for further medial treatment. As a result of being attacked, Plaintiff suffered severe injuries, including fractures to his skull, jaw, and cheek. He also underwent surgery to release intracranial pressure and was in a coma for approximately eight days. *See* Plaintiff's Exs. 29, 30. He continues to experience pain and suffering from those injuries, including severe headaches, dizzy spells, and hearing loss.

23.   Approximately 40 inmates were assailants in the assault.[4] Specialist Romero did not observe the large groups of inmates that were observed by numerous inmate witnesses. The inmate witnesses were positioned at different points throughout the recreation yard, and each observed numerous inmate groups of various sizes forming prior to the assault. Additionally, none of the inmate witnesses observed Specialist Romero in the recreation yard during the time leading up to when the violence occurred.

---

[4]Plaintiff's Ex. 18 (a document from a file labeled "Captain; Inmate Central File" and providing a Description of Incident stating that a "[p]reliminary investigation revealed at least 40 Border Brother gang members assaulted [four] inmates"); Plaintiff's Ex. 21 (a file document entitled "Players" and listing 44 inmates as assailants).

24.     Specialist Romero did not patrol the recreation yard as required under the conditions then existing, and therefore she was not in a position to either observe the groups of inmates while they gathered or discern inmate unrest.

### III.  Conclusions of Law

1.      This Court has jurisdiction over the present action under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1) and § 2671 *et seq*.

2.      Under the Federal Tort Claims Act, federal inmates held in correctional facilities have the right to sue the United States for personal injuries they sustain as a result of a government employee's negligence. United States v. Muniz, 374 U.S. 150, 150 (1963); Jones v. United States, 534 F.2d 53, 54 (5th Cir. 1976).

3.      Claims for personal injuries caused by negligent acts or omissions of government employees, acting within the scope of their employment, are to be considered by district courts "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see* 28 U.S.C. § 2674; Hossic v. U.S., 682 F.Supp 23, 24–25 (M.D. Pa. 1987); Fleishour v. United States, 244 F.Supp 762, 766-767 (N.D. Ill. 1965); *Muniz*, 374 U.S. at 153. Thus, in the present action, the negligence law of Texas applies. *See Hossic*, 682 F.Supp at 24–25.

4.      Under Texas law, a negligence cause of action consists of the following elements: (1) the existence of a legal duty, (2) a breach of that duty, and (3) damages which are proximately caused by the breach of the duty. IHS Cedars Treatment Center of Desoto, Texas, Inc. v. Mason, 143 S.W.3d 794, 798 (Tex. 2004). Proximate cause consists of foreseeability and cause in fact, which can be described as a substantial factor. *Id.* These elements may not be satisfied by only speculation or conjecture. *Id.* at 798–799; Doe v. Boys Club of Greater Dallas, Inc., 907 S.W.2d 472, 477 (Tex. 1995). Cause in fact is

satisfied when it is shown that the act or omission in question was a substantial factor in bringing about the injuries that occurred, and without it, the injuries or harm would not have occurred. *IHS Cedars Treatment Center*, 143 S.W.3d at 799; *Doe*, 907 S.W.2d at 477. The Texas Supreme Court has

> found the Restatement (Second) of Torts to be instructive on this point: [i]n order to be the proximate cause of another's harms, it is not enough that the harm would not have occurred had the actor not been negligent. . . This is necessary, but it is not of itself sufficient. The negligence must also be a substantial factor in bringing about the plaintiff's harm. . . Accordingly, cause in fact is not established where the defendant's negligence does no more than furnish a condition which makes the injuries possible.

*IHS Cedars Treatment Center*, 143 S.W.3d at 799 (quoting Lear Siegler, Inc. v. Travis, 830 S.W.2d 470, 472 (Tex. 1991)). Additionally, foreseeability involves a practical inquiry into whether the harm that resulted could have been reasonably anticipated or contemplated as a consequence of a defendant's behavior. *Doe*, 907 S.W.2d at 478.

5.  The Court concludes that Specialist Romero had a legal duty to reasonably execute both the supervisory and recreational components of her job as a Recreation Specialist. Although a Specialist's primary job is to provide recreational activities for the inmates, among the myriad duties of a Recreation Specialist, it was also Specialist Romero's duty to patrol the recreation yard and supervise inmates, especially in light of the fact that at the time of the incident in question, there were no Recreation Patrol Officers on duty in the recreation yard, as had been the usual practice. Because there were no Patrol Officers, because there were only two correctional employees supervising 300 to 500 inmates scattered throughout the seven acre recreation yard, and because the only other Specialist in the recreation yard was operating the metal detector in an area that did not provide either Specialist Romero or Specialist Martin a coign of vantage in order to adequately supervise the inmates' activities, legitimate or otherwise, it became the responsibility of Specialist Romero to be on heightened awareness regarding the patrol and supervisory duties of her job. The Court does not question the decision of the Federal Correctional Institution officials to reassign the Recreation Patrol Officers from the recreation yard to

another area. Muniz v. United States, 280 F.Supp. 542, 548 (S.D. N.Y. 1968) (stating that a prison warden's decision "as to the number and placement of guards is not a matter on which this court is empowered to substitute its judgment" (citing United States v. Muniz, 374 U.S. 150, 161, n.19 (1963))).

6.    The Court concludes that Specialist Romero breached her duty to supervise inmates in the recreation yard. Although patrolling the yard was not the primary responsibility of a Recreation Specialist, by preoccupying herself with her recreational duties, Specialist Romero neglected the responsibility to monitor the yard, given the circumstances as they existed. The situation was exacerbated when she went to speak to Specialist Martin at the metal detector. By doing so, she left the outdoor recreation area of the yard totally unsupervised. Specialist Romero did not carry out her duties with reasonable care under all the circumstances present prior to, and at the time of, the assault on Plaintiff. Thus, the Court finds that Specialist Romero breached her duty to perform the responsibilities of a correctional officer, albeit a Recreation Specialist.

7.    The Court concludes that Specialist Romero's breach of her duty was the proximate cause of Plaintiff's personal injuries and damages. It is foreseeable that a violent fight among inmates is likely to occur when the recreation yard is left unsupervised. Specialist Romero's breach of the supervisory duties of her job resulted in her failure to notice the groups of inmates gathering. Consequently, her failure to notice the inmate groups resulted in omissions of the preventive measures that Recreation Specialists and Recreation Patrol Officers take to prevent outbreaks of inmate violence, such as gathering information about the nature and purpose of the inmate group and attempting to make the inmates disperse. Accordingly, Specialist Romero's omissions were substantial factors in bringing about the attack on Plaintiff and his resulting injuries.

8.    Based on the foregoing, Court concludes that Specialist Romero was negligent in the performance of her duties as a Recreation Specialist on February 6, 2001. She had a duty to perform her responsibilities as a Recreation Specialist, she breached that duty,

and that breach was the proximate cause of Plaintiff's personal injuries and damages.

## IV.  Damages

1. Plaintiff has claimed damages in the amount of $500,000 for the injuries he sustained as a result of the attack of February 6, 2001. Dkt. No. 26, Ex. 1 at 4. Specifically, Plaintiff's injuries included a skull fracture, jaw fracture and misalignment, loss of hearing in his left ear, severe headaches, dizzy spells, and frequent, acute headaches. *Id.;* Plaintiff's Exs. 20, 23, 29–32. At trial, Plaintiff and Defendant stipulated that Plaintiff had suffered severe injuries. Plaintiff claims damages in the form of past and future physical pain and mental anguish, past and future disfigurement, past and future physical impairment, past and future loss of enjoyment of life, past loss of earnings, and loss of future earning capacity,. Dkt. No. 26, Ex. 1 at 4–5. The Court will assess each of Plaintiff's damage claims separately under Texas law. *See Hossic*, 682 F.Supp at 24–25; *see also* §III, ¶3, *supra*.

***Physical Pain, Mental Anguish, Disfigurement, Physical Impairment, Loss of Enjoyment***

2. Physical pain and suffering are inherently subjective damages that are difficult to quantify. *See* Tagle v. Galvan, 155 S.W.3d 510, 518 (Tex. App. 2004); *see also* Gen. Motors Corp. v. Burry, 203 S.W.3d 514, 554–555 (Tex. App. 2006) ("No objective measures exist for analyzing pain and suffering damages."). Accordingly, a factfinder is given wide discretion in determining the amount of an award compensating an injured party for pain and suffering. *Id.*; *see also* Dawson v. Briggs, 107 S.W.3d 739, 750 (Tex. App. 2003). A plaintiff may also recover an award for future pain and suffering. *See* Cotton Patch Café v. McCarty, 2006 WL 563307, *4 (Tex. App. 2006). Because of its amorphous nature, an award for pain and suffering is necessarily speculative, and each case must be analyzed on its own facts. *Dawson*, 107 S.W.3d at 751.

3.   An award for mental anguish damages must be supported by evidence showing that there is either (1) direct evidence establishing the nature, duration, and severity of the alleged mental anguish, which caused a substantial interruption in the party's daily activities, or (2) circumstantial evidence showing the party suffers from a high degree of mental pain, amounting to much more than mere worry, anxiety, or anger. *Tagle*, 155 S.W.3d at 519 (citing Parkway Co. v. Woodruff, 901 S.W.2d 434, 444 (Tex. 1995)). Injured parties may provide testimony about how their lives have been disrupted by the mental distress they suffer. *Tagle*, 155 S.W.3d at 519 (citing Minnesota Life Ins. Co., v. Vasquez, 133 S.W.3d 320, 324 (Tex. App. 2004)). As in the case of awards for pain and suffering, mental anguish awards are difficult to quantify because of their subjective nature. *Tagle*, 155 S.W.3d at 518; Dawson 107 S.W.3d at 750.

4.   An award for disfigurement involves compensating an individual for injuries that make him feel less complete in appearance. A disfigurement may alter or impair a person's appearance, rendering it unsightly, misshapen, deformed, or imperfect. Doctor v. Pardue, 186 S.W.3d 4, 18 (Tex. App. 2006).

5.   A plaintiff may be awarded damages for physical impairment if (1) the injuries sustained are distinct from, or extend beyond, injuries that are otherwise compensable through other types of damages, such as pain and suffering, mental anguish, or loss of earning capacity, and (2) such distinct injuries have a "substantial" effect on the plaintiff. *Tagle*, 155 S.W.3d at 519; Patlyek v. Brittain, 149 S.W.3d 781, 785–786 (Tex. App. 2004); Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 772 (Tex. 2003) (conducting a lengthy investigation and discussion concerning the inconsistent and disparate views of Texas appellate courts on the scope of physical impairment). "Loss of enjoyment of life" may be considered as an element of physical impairment. *Golden Eagle Archery, Inc.*, 116 S.W.3d at 772; *Doctor*, 186 S.W.3d at 18; *see also* Gen. Motors Corp. v. Burry, 203 S.W.3d 514, 554–555 (Tex. App. 2006) (stating that the scope of physical impairment includes "the loss of the injured party's former lifestyle").

6.   In the present case, Plaintiff sustained multiple skull fractures as a result of the inmate assault, which included injuries to his jaw and right cheek. He underwent surgery to release intracranial pressure and was hospitalized for over two weeks. After he was released from the hospital and returned to the correctional institute in Three Rivers, he was placed in special housing throughout his recovery period. As a result, Plaintiff endured solitary confinement in a small cell[5] for a period of approximately nine months. During his recovery period, he had extreme difficulty walking. Plaintiff even had trouble walking the short distance between his bed and the door of his cell. Plaintiff also had difficulty eating as a result of his fractured jaw. Plaintiff also suffers from claustrophobia, which made medical treatment through the use of MRIs almost impossible. Claustrophobia also made Plaintiff's recovery within the small dimensions of his solitary confinement cell more challenging. Plaintiff suffered from extreme pain throughout his recovery, despite being given medication to alleviate that pain. Currently, six years after the assault, Plaintiff experiences head pain two or three times per week. He also experiences severe migraine headaches, which may cause difficulty walking. Plaintiff endures dizzy spells. He has impaired hearing in his left ear. Plaintiff also has a prominent scar on the left side of his face as a result of his surgery. Plaintiff suffers mentally from the effects of his injuries.

7.   Based on the evidence regarding Plaintiff's injuries, the Court awards Plaintiff $300,000 in damages for physical pain and suffering he experienced, and may continue to experience in the future, as a result of the inmate assault. Furthermore, the Court awards Plaintiff $50,000 in damages for disfigurement as a result of Plaintiff's facial surgical scar.

8.   No evidence was presented establishing a substantial disruption in Plaintiff's daily routine as a result of severe mental stress or anxiety amounting to more than mere worry. Thus, the Court finds that there is insufficient evidence to warrant an award for mental anguish.

---

[5] Plaintiff testified that the cell measured 12 feet by 8 feet.

9.  The Court also finds that there is insufficient evidence to warrant an award for physical impairment that is a separate and distinct loss and extends beyond damages that are otherwise compensated for through other awards. See *Dawson*, 107 S.W.3d at 752–753 (finding that evidence consisting merely of plaintiff's testimony stating that her daily activities were substantially disrupted, that she was not able to carry on with her normal activities, and that her limitations were going to impair her in the future was not enough to justify a separate award for physical impairment).

**Loss of Earnings, Future Earning Capacity**

10.  Lost earnings refer to the actual income lost of a party as a result of the inability to perform a particular job from the time the party incurred the injury until the time of trial. *Dawson*, 107 S.W.3d at 749. In order to be awarded damages for loss of future earning capacity, a plaintiff must present evidence sufficient to allow the factfinder to reasonably measure the amount of plaintiff's potential future earnings in concrete monetary terms. *Tagle v. Galvan*, 155 S.W.3d 510, 519 (Tex. App. 2004). Thus, evidence may be submitted in the form of plaintiff's past earnings, plaintiff's stamina and ability to work with pain, the effects that plaintiff's injury will have on such ability, and plaintiff's work-life expectancy. *Id.*; see also *Reliance Steel & Aluminum Co. v. Sevick*, 2006 WL 563044, *4 (Tex. App. 2006) (citing *Plainview Motels, Inc. v. Reynolds*, 127 S.W.3d 21, 35–36 (Tex. App. 2003)). A plaintiff must present some evidence regarding his or her capacity to work before the injury occurred and the resulting diminished capacity to work as a result of the plaintiff's injury. *Tagle*, 155 S.W.3d at 519; see also *Reliance Steel & Aluminum Co.*, 2006 WL 563044 at *4; *Plainview*, 127 S.W.3d at 36.

11.  In the present case, the only evidence presented by Plaintiff regarding his past earnings or earning capacity was his brief trial testimony stating that he worked for a city irrigation district prior to serving his prison sentence and that he worked at the prison recreation center while he was at the Three Rivers Facility. Plaintiff failed to provide any evidence regarding his past earnings. Plaintiff also failed to present evidence that would

allow the Court to make a reasonable monetary measure of Plaintiff's future earnings. Therefore, the Court finds that there is insufficient evidence to warrant an award for past earnings or loss of earning capacity.

## V.    Conclusion

Based on the foregoing, the Court finds that Plaintiff has established by a preponderance of the evidence that Debra Romero, and therefore Defendant, was negligent in the performance of her duties as a Recreation Specialist at the Federal Correctional Institution in Three Rivers, Texas on February 6, 2001.

Therefore, the Court **ENTERS** judgment for Plaintiff in the amount of $350,000.

The foregoing shall constitute findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

DONE at Brownsville, Texas, this ___9th day of March, 2007.

_____
Hilda G. Tagle
United States District Judge